# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 12, 2014

Lyle W. Cayce
Clerk

No. 12-60264

TAYLOR BELL; DORA BELL, individually and as mother of Taylor Bell,

Plaintiffs - Appellants

v.

ITAWAMBA COUNTY SCHOOL BOARD; TERESA MCNEECE, Superintendent of Education for Itawamba County, individually and in her official capacity; TRAE WIYGUL, Principal of Itawamba Agricultural High School, individually and in his official capacity,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Mississippi

Before BARKSDALE, DENNIS, and GRAVES, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

This appeal raises a First Amendment challenge to a public high school student's suspension and transfer to alternative school for his off-campus posting on the Internet of a rap song criticizing, with vulgar and violent lyrics, two named male athletic coaches for sexually harassing female students at his school. The aspiring student rapper, Taylor Bell, composed the song off campus, recorded it at a professional studio unaffiliated with the school, and posted it on his Facebook page and on YouTube using his personal computer

No. 12-60264

while at home.   Bell had never before been charged with a serious school disciplinary violation.   After the disciplinary action was imposed and affirmed by the Itawamba County School Board, Bell and his mother, Dora Bell, sued the School Board, its Superintendent, and the school's Principal, for violation of Bell's freedom of speech under the First Amendment and Dora Bell's substantive-due-process right to parental authority under the Fourteenth Amendment.   Upon cross-motions for summary judgment, the district court rendered summary judgment for the School Board and its officials.   The Bells appealed.

We reverse the district court's judgment in favor of the School Board against Taylor Bell and render summary judgment against the School Board in favor of  Taylor Bell, awarding him nominal damages as prayed for, and other relief, for the Board's violation of his First Amendment right to freedom of speech.   The summary-judgment evidence and materials establish that Bell composed and recorded his rap song completely off campus; that he used his home computer to post it on the Internet during non-school hours; and that the School Board did not demonstrate that Bell's song caused a substantial disruption of school work or discipline, or that school officials reasonably could have forecasted such a disruption.   Otherwise, the district court's grant of summary judgment in favor of Defendants-Appellees against Dora Bell is affirmed, as well as the district court's summary judgment for the individual school officials.[1]

---

[1] The Bells waived their appeal of the district court's ruling on Dora Bell's Fourteenth Amendment substantive-due-process claim by failing to raise that issue in their initial brief. We therefore affirm the district court's ruling without addressing the merits of that claim. For the same reason, we affirm the district court's alternative holding that qualified immunity bars Taylor Bell's suit against the individual defendants.   Therefore, we consider only Taylor Bell's First Amendment claim against the School Board.

2

No. 12-60264

## I.

## A.

In December 2010, Taylor Bell was an eighteen-year-old senior at Itawamba Agricultural High School with no record of any disciplinary problem aside from a single in-school suspension for tardiness. Bell is an aspiring rap[2] musician, has written lyrics and music since he was a young boy, and began recording and seriously pursuing music in his early teens.[3]  In this respect, Bell considers himself an "artist."  Bell testified that several of his female friends at school told him before Christmas 2010 that two male athletic coaches at school, Michael Wildmon and Chris Rainey, had inappropriately touched them and made sexually-charged comments to them and other female students at school.  The record also contains affidavits from female students stating that they informed Bell of this misconduct by Wildmon and Rainey. According to these affidavits, Wildmon told one of Bell's classmates, R.M.,[4] that she had a "big butt" and that he would date her if she were older.  She also stated that Wildmon had looked down her shirt, inappropriately touched

---

[2] "Rap has been defined as a 'style of black American popular music consisting of improvised rhymes performed to a rhythmic accompaniment.'" *Campbell v. Acuff-Rose Music, Inc.*,510 U.S. 569, 572, n.1 (1994) (quoting The Norton/Grove Concise Encyclopedia of Music 613 (1988)).  According to scholars, the genre "derives from oral and literary traditions of the Black community."  Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Colum. J.L. & Arts 1, 22 (2007).  Today, rap music is not only a musical form with its own unique artistic conventions, *id.* at 20, but also a multi-billion-dollar commercial industry.  *See, e.g.,* Julie Watson, *Rapper's Delight: A Billion-Dollar Industry*, Forbes.com (Feb. 18, 2004), http://www.forbes.com/2004/02/18/cx_jw_0218hiphop.html

[3] Bell testified that he regularly records music in a studio ("once a week" if possible).

[4] As the students are not parties to this suit and were minors at the time these events took place, we use only their initials to protect their privacy.

her, and told her that she was "one of the cutest black female students" at Itawamba.     Another student, D.S., told Bell that she witnessed these incidents between Wildmon and R.M.; in addition, D.S. informed Bell that Rainey had "rubbed [her] ears at school without her permission, and [that she] had to tell him to stop."   Yet another student, S.S., told Bell that Rainey commented to her that he thought she had "'messed' with some nasty people" and suggested that he otherwise would have, in S.S.'s words, "turn[ed] [her] back 'straight' from being 'gay.'"   A fourth student, K.G., told Bell that Rainey approached her in the gym and said, "damn baby, you are sexy."

Bell admitted that he did not report these complaints to school authorities, but he explained that, in his view, the school officials generally ignored complaints by students about the conduct of teachers and coaches. During the Christmas holidays, while school was not in session, Bell composed and recorded a rap song about the female students' complaints at a professional recording studio unaffiliated with the school.   Bell did not use any school resources in creating or recording the song.   According to Bell, he believed that if he wrote and sang about the incidents, somebody would listen to his music and that it might help remedy the problem of teacher-on-student sexual harassment.

The song[5] accused Wildmon of telling students that they are "sexy" and looking down female students' shirts, and it stated that he "better watch [his] back," and that "white dude, guess you got a thing for them yellow bones / looking down girls shirts / drool running down your mouth / you fucking with the wrong one / gonna get a pistol down your mouth."   The refrain of the song

---

[5] Bell's Facebook page labels the song "P.S. Koaches," but Bell's complaint identifies the song's title as "PSK The Truth Needs to be Told."

repeated lines to the effect of "middle fingers up if you hate that nigga / middle fingers up if you can't stand that nigga / middle fingers up if you want to cap that nigga."   The song referred to Rainey as a second "Bobby Hill," a former Itawamba football coach who was arrested and accused of sending explicit text messages to a minor in 2009.   The lyrics also accused Rainey of "rubbing black girls' ears in the gym."   The song's lyrics in full were as follows:[6]

> Let me tell you a little story about these Itawamba coaches
> Dirty ass niggas like some fucking coacha roaches
> Started fucking with the whites and now they fucking with the blacks
> That pussy ass nigga Wildmon got me turned up the fucking max.[7]
>
> Fucking with the students and he just had a baby
> Ever since I met that cracker I knew that he was crazy
> Always talking shit cause he know I'm from the city[8]
> The reason he fucking around cause his wife ain't got no titties
>
> This nigga telling students that they sexy, betta watch your back
> I'm a serve this nigga like I serve the junkies with some crack
> Quit the damn basketball team / The coach a pervert
> Can't stand the truth so to you these lyrics going to hurt[9]
>
> What the hell was they thinking when they hired Mr. Rainey

---

[6] The record contains an audio recording of the song lyrics and three different transcripts of the recording : (1) a transcript submitted by the School Board in its response to Bell's preliminary-injunction motion, (2) a transcript submitted by Bell at the preliminary-injunction hearing, and (3) a transcript submitted by the School Board at the preliminary-injunction hearing.   Where appropriate, spelling and typography are standardized and the lyrics are harmonized as between the recorded and transcribed versions of the song entered into the district court record.   Where the lyrics differ between the three different transcriptions in the record, the differences are noted.   However, none of the lyrical differences is dispositive to the outcome of this case.

[7] Or "turnin' to a fucking mess."

[8] Or "daw-city."

[9] Or "So the union league is gone [*sic*] hurt."

No. 12-60264

Dreadlock Bobby Hill the second / He the same see
Talking about you could have went pro to the NFL
Now you just another pervert coach, fat as hell[10]

Talking about you gangsta / Drive your mama's PT Cruiser[11]
Run up on T-Bizzle[12] / I'm going to hit you with my rueger[13]

Think you got some game / Cuz you fucking with some juveniles
You know this shit the truth so don't you try to hide it now
Rubbing on the black girls' ears in the gym
White hoes, change your voice when you talk to them

I'm a dope runner, spot a junkie a mile away
Came to football practice high, remember that day
I do, to me you a fool nigga
30 years old fucking with students at the school

Hahahah You's a lame and it's a damn shame
Instead you was lame, eat shit, the whole school got a ring mutherfucker.[14]

Heard you textin'[15] number 25[16] / You want to get it on
White dude, guess you got a thing for them yellow bones
Looking down girls' shirts / Drool running down your mouth

---

[10] Or "as bad as hell."

[11] Or "try your mama beat crews up."

[12] "T-Bizzle" refers to Taylor Bell.

[13] Or "ruler." The transcript of the lyrics submitted by Bell at the preliminary-injunction hearing specifies the lyric is "rueger." However, as noted *supra*, our holding does not pivot on the applicability of one term or the other.

[14] Or "You so lame it's a damn shame/Instead you wadn't shit, the whle team gotta reign Mother Fucker."

[15] Or "kissing."

[16] "Number 25" refers to one of the female students.

6

No. 12-60264

You fucking with the wrong one / Going to get a pistol down your mouth/Pow[17]

OMG[18] took some girls in the locker room in PE
Cut off the lights you motherfucking freak
Fucking with the youngins
Because your pimpin game weak[19]
How he get the head coach I don't really fucking know
But I still got a lot of love for my nigga Joe
And my nigga Makaveli and my nigga Cody
Wildemon talk shit bitch don't even know me

Middle fingers up if you hate that nigga
Middle fingers up if you can't stand that nigga
Middle fingers up if you want to cap that nigga
Middle fingers up / he get no mercy nigga.

In the first few days of January 2011,[20] Bell uploaded the song to his profile on Facebook using his private computer during non-school hours. On Facebook, the song was accessible to Bell's pre-approved online "friends."[21]

---

[17] Or "boww" according to the transcript of lyrics provided by Bell at the preliminary injunction hearing.

[18] "[O]h my God."

[19] Or "cause you pimpin can't read."

[20] Bell testified at the preliminary-injunction hearing that he posted the song "on the first Wednesday in January," which would be January 5, but Bell's brief in support of his preliminary-injunction motion states that the song was posted on January 3.

[21] Although a screen shot of Bell's Facebook page contained in the record indicates he had approximately 1,380 "friends," there is no evidence of how many of his "friends" were current students at Itawamba. In addition, the evidence does not reflect how many "friends" listened to the song. The dissent argues that three of the "friends" shown in a screen shot of Bell's Facebook page were Bell's "fellow students." However, at most, the screen shot shows only that three "friends" were a part of the Itawamba Agricultural High School network, and does not evince whether those individuals were students currently enrolled at the high school, former students who had graduated or transferred but remained on the network, or individuals who were part of the Itawamba network for some other reason. Although comments directly below Bell's Facebook posting indicate that some individuals listened to the song, there is no evidence whether those individuals were fellow students.

The Facebook website was blocked on school computers. Although any of Bell's Facebook "friends" potentially could use a cellphone to access the song on Facebook, school regulations prohibited students from bringing cellphones to school.

Upon returning to school after the Christmas holidays, Bell testified that he never encouraged anyone at school—students or staff—to listen to the song. He further testified that he never played the song at school. No evidence was offered by the School Board to the contrary.

On January 6, 2011,Wildmon received a text message inquiring about the song from his wife, who had been informed of Bell's Facebook posting by a friend. In response to Wildmon's inquiry, a student allowed him to listen to the song on the student's cellphone. Wildmon immediately reported it to the Principal, Trae Wiygul, who, in turn, informed Teresa McNeece, the Superintendent.

The next day, Wiygul, McNeece, and the school district's attorney, Michele   Floyd, questioned Bell about the song and its accusations. According to McNeece, she asked whether Bell meant that the teachers were having sexual relations with students, to which Bell responded that the lyrics meant the teachers were "messing with kids"—not having sexual relations with them. Bell testified, somewhat differently, that he told the school officials that "everything [he] said in the song was true." According to Bell, the school

---

Moreover, as discussed at greater length *infra*, an examination of those Facebook comments (*e.g.*, "Hey, don't forget me when you're famous" and "Lol. . . Mane Im tellin you cuz . . . been tellin you since we was little . . . keep fuckin with it man you got all the talent in the world . . .") and Bell's response to them (*e.g.*, "thanks mane . . . I JUST NEED A BIG BREAK THROUGH . . . no wut I mean??") undermines the dissent's contention that the song was viewed or reasonably could have been viewed as a genuine threat of violence by Bell against the coaches rather than the artistic expression of an aspiring rap musician seeking fame and fortune.

officials never suggested that Wildmon or Rainey felt threatened; instead, it seemed to Bell, the problem was that Wildmon felt as though "his name had been slandered."   Bell testified that the officials never said that school had been disrupted as a result of the song.   After speaking with McNeece and the other officials, Bell was sent home for the rest of that day, which was a Friday. Bell testified that he was not given a clear answer as to the specific reason why he was being sent home that day.

Due to snow, the school was closed until Friday of the following week. During that time, Bell created a more polished version of the song,[22] which included various sound effects, a slideshow,[23] and a brief monologue at the conclusion.   In this monologue, Bell explained the genesis of his song:

> A lot of people been asking me lately you know what was my reasoning behind creating P.S. Koaches.   It's . . . something that's been going on . . . for a long time [] that I just felt like I needed to address.   I'm an artist . . . I speak real life experience. . . . The way I look at it, one day, I'm going to have a child.   If something like this was going on with my child . . . it'd be '4:30.'[24]  . . . That's just how it is . . .

Bell then uploaded the final version of the song to YouTube from his home computer before classes resumed.   Bell later explained that he created and posted this YouTube version of the song to help people, including school officials, "more clearly understand exactly what [he] was saying" in the song.

When school resumed on the following Friday, Bell returned to school. He testified that he could discern no disruption due to the song, nor did he tell

---

[22] He explained that the version initially posted to Facebook had been a "raw" and "unfinished" copy of the song.

[23] The record lacks details about the precise contents of the slideshow.

[24] Bell explained that "4:30" means "it's over" or "I'm leaving."

anyone at school—students or staff—to listen to the song.   However, around mid-day on that date, he was removed from class by the Assistant Principal, who informed him that he was suspended effective immediately, pending a disciplinary hearing.   However, school officials did not require Bell to immediately vacate the school, and he remained in the school commons until his school bus arrived at day's end.

**B**.

At the disciplinary/due process hearing before the school's Disciplinary Committee on January 26, 2011, the school district's attorney, Michele Floyd, stated that the purpose of the hearing was to determine whether Bell had "threaten[ed], intimidat[ed], and/or harass[ed] one or more school teachers."[25] Bell and his mother, Dora Bell, were present and were represented by counsel. At the beginning of the hearing, Principal Wiygul presented a brief summary of the events leading up to the disciplinary hearing.   The Committee then listened to the YouTube version of the song.

Bell was asked why he composed, recorded, and posted the song.   He explained that he had written the rap song in response to the coaches' inappropriate behavior toward female students.   He testified that he did not believe that telling the school authorities about the coaches' misconduct would have accomplished anything because school officials had failed to respond to

---

[25] During the hearing, Bell's counsel requested information about the initial decision by school officials to suspend Bell and what the basis for that decision had been.   Floyd responded that those issues were not the purpose of the hearing, explaining again that the hearing's purpose was to determine if Bell had harassed, intimidated, or threatened teachers through his off-campus posting of his song on the Internet.   In addition, when Bell's attorney sought to bring attention to affidavits from the female students corroborating the song's accusations, Floyd stated that the Committee would not consider at the proceeding the truth or merits of the female students' allegations that the coaches sexually harassed them.

other students' complaints in the past.[26]    During the hearing, Bell presented letters from female students corroborating the allegations of the coaches' misconduct.    The Committee stated that the Board was concerned about the coaches' possible misconduct and would investigate those allegations, but it explained that those allegations were not relevant to Bell's hearing.

The Committee also questioned Bell about his intentions with respect to the song and whether the violent lyrics reflected an intention to harm the coaches.    Bell conveyed that the song was a form of artistic expression meant to reflect his real-life experiences[27] and to increase awareness of the situation.    Bell explained that the lyrics were not intended to intimidate, threaten, or harass Wildmon or Rainey.    However, he indicated that the lyrics did reflect the possibility that a parent or relative of one of the female students might eventually react violently upon learning that the coaches were harassing their children—not that *Bell* would react violently.[28]    Bell explained that he uploaded the remastered version of the song to YouTube because he wanted people to "clearly understand" his intentions with respect to the song and that

---

[26] His testimony was unclear whether he meant that school officials failed to respond to student complaints generally or to complaints specifically concerning the allegations made in the song.

[27] The dissent concludes that Bell's statement that he was writing about real-experiences is an indication that Bell's rap was not rhetorical but instead constituted a real threat of violence.    To the contrary, when Bell stated that he was writing about real-life experiences, he was referring to the real-life experience of male high school coaches sexually harassing female students.

[28] Specifically, Bell stated: "I didn't say that I was going to do that. . . . I'm from the country.    And you know, I know how people are. . . . Eventually . . . somebody's parents . . . or their brother . . . or their big sister or somebody might get word . . . I was just foreshadowing something that might happen. . . . I wasn't saying that I was going to do that."    One of the Committee members indicated that she agreed with Bell, stating ". . . it sound like to me you were saying that if they don't stop what they're doing then a parent kinda is gonna do that, not really him [indicating Bell]."

11

the YouTube version was more targeted at record labels than the Facebook version. He also explained that he did not tell anyone to listen to the song at school.

At the disciplinary/due process hearing, no evidence was presented that the song had caused or had been forecasted to cause a material or substantial disruption to the school's work or discipline. In addition, there was no evidence presented indicating that any student or staff had listened to the song on the school campus, aside from the single instance when Wildmon had a student play the song for him on his cellphone in violation of school rules. Neither of the coaches named in the song attended or testified at the hearing, and no evidence was presented at the hearing that the coaches themselves perceived the song as an actual threat or disruption.

At the very end of the hearing, one of the Committee members provided the following admonition to Bell: "I would say censor your material. . . . Because you are good [at rapping], but everybody doesn't really listen to that kind of stuff. So, if you want to get [] your message out to everybody, make it where everybody will listen to it. . . . You know what I'm saying? Censor that stuff. Don't put all those bad words in it. . . . The bad words ain't making it better. . . . Sometimes you can make emotions with big words, not bad words. You know what I'm saying? . . . Big words, not bad words. Think about that when you write your next piece."[29]

---

[29] The dissent is mistaken in asserting that one member of the Committee "explain[ed] there would have been no problem with the rap recording or its vulgar language if it had not included threats against school employees." It is true that one Committee member indicated that Bell should not have "put names" in the rap (noting that she does not use real names when she writes poetry), from which the dissent apparently derives its misinterpretation. However, that member subsequently admonished Bell to use "big words, not bad words" in his raps and to "censor that stuff," thus providing Bell poetic or artistic advice. That Committee member did not characterize the statements in Bell's rap as

No. 12-60264

The next day, Floyd sent Bell's mother a letter setting forth the Committee's decision to uphold the suspension already imposed on Bell, to place Bell in an alternative school for the remainder of the nine-week grading period, and to prohibit Bell from attending any school functions during that time. The letter stated that the Committee had concluded that whether Bell's song constituted a "threat to school district officials was vague."[30] But the Committee did find that the song harassed and intimidated the coaches in violation of Itawamba School Board policy[31] and unspecified state law.

The School Board affirmed the Disciplinary Committee's decision on February 7, 2011, which was memorialized in a letter sent to Dora Bell from Floyd on February 11, 2011. In that letter, Floyd stated: "As you are aware, [the Board] determined that Taylor Bell did threaten, harass and intimidate school employees in violation of School Board policy and Mississippi State Law."[32] The Board did not assign any additional reasons for its decision.

---

threatening.

[30] Specifically, the letter stated: "Based on the testimony given at the due process hearing on January 26, 2011, the Discipline Committee determined that the issue of whether or not lyrics published by Taylor Bell constituted threats to school district teachers was vague; however, they determined that the publication of those lyrics did constitute harassment and intimidation of two school district teachers, which is a violation of School Board Policy and state law." The proceedings before the Committee were audio-recorded but were not transcribed; only a sound recording of it is in the record.

[31] The School District's "Discipline–Administrative Policy" prohibits "[h]arassment, intimidation, or threatening other students and/or teachers."

[32] Specifically, Floyd's letter stated: "As you are aware, on February 7, 2011, the Itawamba County Board of Education determined that Taylor Bell did threaten, harass and intimidate school employees in violation of School Board policy and Mississippi State Law. As a result, the recommendations of the disciplinary hearing were upheld by the Board of Education." The Board did not cite the state law to which it referred; nor has it done so in its litigation documents. Floyd's letter does not explain the difference between the Committee's finding that the issue of whether Bell's lyrics constituted a threat was "vague" and the School Board's finding that Bell had "threatened, intimidated, and harassed" the teachers. The record is unclear regarding the exact evidence presented to the School Board.

13

No. 12-60264

## C.

Taylor and Dora Bell filed this civil action under 42 U.S.C. § 1983 on February 24, 2011, in the United States District Court for the Northern District of Mississippi against the Itawamba County School Board, Superintendent McNeece (individually and in her official capacity), and Principal Wiygul (individually and in his official capacity), alleging that the defendants violated Taylor Bell's First Amendment right to freedom of speech by imposing school discipline on Bell for his off-campus composition, recording and Internet-posting of his rap song.[33]   Bell sought nominal damages and injunctive relief ordering reinstatement of his school privileges, expungement from his school records of all references to the incident, and prevention of the defendants from enforcing the school disciplinary code against students for expression that takes place outside of the school or school-sponsored activities, as well as attorneys' fees and costs.

On March 10, 2011, the district court held a hearing on the preliminary-injunction motion.   At the hearing, a number of different witnesses testified, including the two coaches named in the song.   Rainey testified that he had not heard the song and felt it was "just a rap," not to be taken seriously, and that he felt that if he "let it go, it [would] probably just die down."   However, he stated that the song had "affected" the way he "talk[ed] to kids," leading him to avoid interactions with students that might be interpreted as being

---

Based on the testimony of school officials at the preliminary-injunction hearing, the Board's decision apparently was based on the same audio-recording of Bell's song heard by the Disciplinary Committee.

[33] The complaint also alleged that defendants violated Dora Bell's Fourteenth Amendment substantive-due-process right to control her child's upbringing.   As noted *supra*, the district court granted summary judgment for the defendants on this claim, and the Bells have not appealed that determination.

14

inappropriate.   For example, he indicated that he felt the song had affected his ability to act like a "parent figure" to students.   He also testified that students had begun spending more time in the gym since the posting of the song, but he could not confirm this was a result of Bell's song.   Rainey further testified that most of the talk amongst students has been about Bell's suspension and transfer to alternative school.

Wildmon testified that the song caused him to be more cautious around students and to avoid the appearance that he was behaving inappropriately toward them.[34]   He further testified that students around him "seem[ed] to act normal" after the song was published to the Internet.   Wildmon said that he took the lyrics "literally" and that he felt "scared" after hearing the song since "you never know in today's society . . . what somebody means, how they mean it."   In this regard, Wildmon testified that, after hearing the song, he would not let his players leave basketball games until after he was in his vehicle.   In addition, Wildmon denied ever texting "a girl, like No. 25, on the basketball team," as referenced in the song's lyrics.   Otherwise, there is no indication that either party questioned the coaches about the truth or falsity of the female students' allegations.

At the conclusion of the hearing, the district court denied the motion for the preliminary injunction as moot because Bell had only one day of alternative school remaining.   Thereafter, following the parties' filing of cross-motions for summary judgment, the district court granted summary judgment in favor of the Defendants.   The court concluded that, pursuant to *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the song's lyrics

---

[34] For example, Wildmon stated: "I tried to make sure, you know, if I'm teaching, and if I'm scanning the classroom, that I don't look in one area too long.   I don't want to be accused of, you know, staring at a girl or anything of that matter."

No. 12-60264

"in fact caused a material and/or substantial disruption at school and that it was reasonably foreseeable to school officials the song would cause such a disruption." Specifically, the court stated that Wildmon's and Rainey's testimony that the song "adversely affected" their teaching styles constituted an "actual disruption" to school activities. The court also concluded that it was "reasonably foreseeable" that the song, which "levies charges of serious sexual misconduct against two teachers using vulgar and threatening language and . . . is published on Facebook.com to at least 1,300 'friends' . . . and the unlimited internet audience on YouTube.com, would cause a material and substantial disruption at school." The Bells timely appealed.

## II.

We review a district court's grant of summary judgment *de novo*, applying the same standard as the district court. *See Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008). "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). "When parties file cross-motions for summary judgment, 'we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" *Duval v. Northern Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013) (quoting *Ford Moto Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001)).

## III.

The principal issue presented by this case is whether a public high school violated the First Amendment by punishing a student for his off-campus speech, *viz.*, his rap song posted on the Internet that criticized two male

coaches for their improper conduct toward minor female students.    This case does not involve speech that took place on school property or during a school-approved event off campus.    Nevertheless, the district court, interpreting *Tinker v. Des Moines Independent Community School District* as applying directly to students' off-campus speech, as well as their on-campus speech, held that the School Board had authority to regulate and punish Bell's speech because the evidence established that his rap song had "in fact" substantially disrupted the school's work and discipline and that it was "reasonably foreseeable" that the song would cause such a disruption.    859 F. Supp. 2d 834, 840 (N.D. Miss. 2012).    We reverse the district court's application of *Tinker* as legally incorrect, and conclude that *Tinker* could not afford the School Board a defense in this case because the summary-judgment evidence and materials do not support the conclusion that a material and substantial disruption at school actually occurred or reasonably could have been forecasted.

Contrary to the district court's conclusions, *id.* at 837–38, the Supreme Court's "student-speech" cases, including *Tinker*, do not address students' speech that occurs off campus and not at a school-approved event.    The Court has not decided whether, or, if so, under what circumstances, a public school may regulate students' online, off-campus speech, and it is not necessary or appropriate for us to anticipate such a decision here.    Even if *Tinker* were applicable to the instant case, the evidence does not support the conclusion, as required by   *Tinker*, that Bell's Internet-posted song substantially disrupted the school's work and discipline or that school officials reasonably could have forecasted that it would do so.    Moreover, we reject the School Board's alternative argument that the plainly rhetorical use of violent language contained in Bell's song falls within this court's narrow holding in *Ponce v.*

*Socorro Independent School District*, 508 F.3d 765 (5th Cir. 2007), that student speech threatening a Columbine-style mass school shooting was not protected by the First Amendment.   Furthermore, in light of the rap's factual context, its lyrics' conditional nature, and the reactions of its listeners, we likewise reject the argument that Bell's rap song was excepted from First Amendment protections because it constituted a "true threat."

## A.

"That courts should not interfere with the day-to-day operations of schools is a platitudinous but eminently sound maxim which this court has reaffirmed on many occasions."   *Shanley v. Northeast Indep. Sch. Dist.*, 462 F.2d 960, 967 (5th Cir. 1972).   Nevertheless, this court "laid to rest" more than a half century ago "the notion that state authorities could subject students at public-supported educational institutions to whatever conditions the state wished."   *See id.* (citing *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961)).   "And of paramount importance is the constitutional imperative that school boards abide constitutional precepts: 'The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted.'"   *Id.*   (citing *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)).   Thus, "[t]he authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards," including the dictates of the First Amendment.   *See Goss v. Lopez*, 419 U.S. 565, 575 (1975).

Because speech is often provocative and challenging, and may strike at prejudices and preconceptions and have profoundly unsettling effects as it presses for the acceptance of an idea or cause, the First Amendment protects speech against restriction or punishment by the government.   *Cox v.*

*Lousiana*, 379 U.S. 536 (1965); *see also Texas v. Johnson*, 491 U.S. 397, 408–10, 414 (1989); *Hustler Magazine v. Falwell*, 485 U.S. 46, 54–57 (1988); *Cohen v. California*, 403 U.S. 15 (1971). In *Tinker*, the Supreme Court considered whether the First Amendment's protections against government censorship apply to student speech inside public schools. The Court recognized that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but also observed that those rights must be calibrated "in light of the special characteristics of the school environment." 393 U.S. at 506–07. To reconcile these competing interests, the Court fashioned a rule that has become the touchstone for assessing the scope of students' on-campus First Amendment rights ever since: while on campus, a student is free to "express his opinions, even on controversial subjects, if he does so without 'materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others." *Id.* at 513 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)). However, speech by the student that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513.

Therefore, under *Tinker*, school officials may prohibit student speech and expression upon showing "facts which might reasonably have led school authorities to forecast [that the proscribed speech would cause] substantial disruption of or material interference with school activities." *Id.* at 514. School officials "must be able to show that [their] action[s] [were] caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509. It is a school's burden to prove that its suppression of student speech conforms with this

governing standard.[35]    *Id.* at 511–14; *see also Shanley*, 462 F.2d at 969 ("When the constitutionality of a school regulation is questioned, it is settled law that the burden of justifying the regulation falls upon the school board.").

This court has further elaborated on *Tinker*'s substantial-disruption standard.   "Although school officials may prohibit speech based on a forecast that the prohibited speech will lead to a material disruption, the proscription cannot be based on the officials' mere expectation that the speech will cause such a disruption."   *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 221 (5th Cir. 2009).    Further, school officials "must base their decisions 'on fact, not intuition, that the expected disruption would probably result from the exercise of the constitutional right and that foregoing such exercise would tend to make the expected disruption substantially less probable or less severe.'" *Id.* at 221-22   (quoting   *Butts v. Dallas Indep. Sch. Dist.*, 436 F.2d 728, 731 (5th Cir. 1971)); *see also Butts*, 436 F.2d at 732 ("[T]here must be some inquiry, and establishment of substantial fact, to buttress the determination."); *Shanley*, 462 F.2d at 970 ("[T]he board cannot rely on *ipse dixit* to demonstrate the 'material and substantial' interference with school discipline.").

Since *Tinker*, the Supreme Court has recognized that, even if on-campus speech or speech at school-approved events is non-disruptive within the meaning of *Tinker*, school officials may restrict that speech in a limited set of circumstances: if it is lewd or vulgar, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986), if it is school-sponsored and the restriction is "reasonably

---

[35] "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.   Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained."   *Id.* at 509 (citing *Burnside*, 363 F.2d at 749).

No. 12-60264

related to legitimate pedagogical concerns," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), or if it is reasonably viewed as promoting the use of illegal drugs, *Morse v. Frederick*, 551 U.S. 393, 403 (2007).   However, in all of these cases, the speech at issue occurred on campus or at a school-approved event where the school's conduct rules expressly applied.    Moreover, members of the Court have taken great pains to emphasize that these exceptions to the *Tinker* "substantial-disruption" test are narrowly confined and do not provide school officials with broad authority to invoke the "special characteristics of the school environment" in order to circumvent their burden of satisfying the *Tinker* test in factual scenarios that do not fit within the exceptions to *Tinker* established by *Fraser*, *Hazelwood,* and *Morse.    See, e.g., Morse*, 551 U.S. at 422–23 (Alito, J., concurring) ("I join the opinion of the Court on the understanding that (1) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (2) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as 'the wisdom of the war on drugs or of legalizing marijuana for medicinal use.'") (internal citation omitted).

Contrary to the district court's conclusion, [36] the Supreme Court in *Tinker* did not hold that the "substantial-disruption" test applies to off-campus speech.    Instead, when the Court stated that, "[a] student's rights . . .   do not embrace merely the classroom hours" and that, "conduct by the student, in class or out of it, which . . . materially disrupts . . . is, of course, not immunized

---

[36] The district court erroneously concluded that "the U.S. Supreme Court in *Tinker* specifically ruled that off-campus conduct causing material or substantial disruption at school can be regulated by the school."    *See Bell*, 859 F. Supp.2d at 837–38.

No. 12-60264

by the constitutional guarantee of freedom of speech[,]" *Tinker*, 393 U.S. at 512–13, the Court was simply indicating that the delicate balance between the protection of free speech rights and the regulation of student conduct extends to all facets of on-campus student speech and not just that occurring within the classroom walls.   Accordingly, the Court further stated, "When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others."   *Id.* (internal citation omitted). When read in context, the *Tinker* Court did not intend that its holding would allow a public school to regulate students' freedom of speech at home and off campus.[37]   Rather, the Court meant that the governing analysis would apply "in class or out of" the classroom while the student is on campus during

---

[37] The dissent erroneously contends that "technological developments," especially the Internet, have "rendered the distinction [between on- and off-campus speech] obsolete." Although we certainly acknowledge that the Internet has yielded previously uncontemplated factual scenarios that pose difficult questions, it is not our place to anticipate that the Supreme Court   will hold that the Internet has vitiated the distinction between on- and off-campus student speech, thus expanding the authority of school officials to   regulate a student's speech when he or she is at home during non-school hours.   *Accord Morse*, 551 U.S. at 424 (Alito, J., concurring) ("It is a dangerous fiction to pretend that parents simply delegate their authority–including their authority to determine what their children may say and hear–to public school authorities."); *Shanley*, 462 F.2d at 964 ("It should have come as a shock to the parents of five high school seniors . . . that their elected school board had assumed suzerainty over their children before and after school, off school grounds, and with regard to their children's rights of expressing their thoughts.   We trust that it will come as no shock whatsoever to the school board that their assumption of authority is an unconstitutional usurpation of the First Amendment.").   Further, it is especially inappropriate for us to pronounce such a consequential rule in the present case, where the evidence does not support a conclusion that the speech has caused, or reasonably could have been forecasted to cause, a substantial disruption of the school's work or discipline.

No. 12-60264

authorized hours.    The Court's subsequent student speech cases make this

distinction clear.    *See Hazelwood*, 484 U.S. at 266.[38]

---

[38] A number of circuit courts have dealt with the question of *Tinker*'s reach beyond the schoolyard.    The Second, Fourth, and Eighth Circuits have concluded that *Tinker* applies to off-campus speech in certain circumstances.    *See, e.g., Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008) (student disqualified from running for class secretary after posting a vulgar and misleading message about the supposed cancellation of an upcoming school event on a web log   from home); *Kowalski v. Berkeley County Schs.*, 652 F.3d 565 (4th Cir. 2011) (student suspended for creating and posting to a MySpace webpage that was largely dedicated to ridiculing a fellow student); *S.J.W. v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771 (8th Cir. 2012) (students suspended for creating website with offensive and racist comments discussing fights at their school and mocking black students, as well as sexually explicit and degrading comments about particular female classmates).    These circuits have imposed their own unique threshold tests before applying *Tinker* to speech that originates off campus. For example,   the Eighth Circuit requires that it be "reasonably foreseeable that the speech will reach the school community," *S.J.W.*, 696 F.3d at 777, while the Fourth Circuit requires that the speech have a sufficient "nexus" to the school. *Kowalski*, 652 F.3d at 573.

This court, along with the Third Circuit, has left open the question of whether the *Tinker* "substantial-disruption" test can apply to off-campus speech.    In *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926, 930 (3d Cir. 2011) (en banc), the Third Circuit assumed, without deciding, that *Tinker* applied to a student's creation of a parody MySpace profile mocking the school principal, but held that it was not reasonably foreseeable that the speech would create a substantial disruption.    In a separate concurrence, five judges expressed their position that *Tinker* does not apply to off-campus speech and that "the First Amendment protects students engaging in off-campus speech to the same extent it protects speech by citizens in the community at large."    *Id*. at 936 (Smith, C.J., concurring).    In another Third Circuit en banc case decided the same day as *Snyder*, and also involving a principal parody profile, the school district did "not dispute the district court's finding that its punishment of [the student] was not appropriate under *Tinker*."    *Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 216 (3d Cir. 2011) (en banc).    The school district relied instead on *Fraser*.    *Id*.    But the court went on to note that *Fraser* did not allow the school "to punish [the student] for expressive conduct which occurred outside of the school context." *Id*. at 219. In *Porter v. Ascension Parish School Board*, this court similarly left open the question of whether *Tinker* applied to off-campus student speech.    393 F.3d 608, 615–16 n.22 (5th Cir. 2004) (student's sketch depicting violent siege on school was speech protected by the First Amendment and not "on-campus" speech subject to school regulation, where student had completed drawing in his home, stored it for two years, and never intended to bring it to campus, but rather stored it in closet where it remained until, by chance, it was unknowingly taken to school by his brother; but principal was not objectively unreasonable and therefore entitled to qualified immunity and plaintiff's claim against school officials in their official capacity was waived because plaintiff failed to brief the issue).

No. 12-60264

In the instant case, the School Board may not assert *Tinker* as a defense because, even assuming *arguendo* that the *Tinker* "substantial-disruption" test could be applied to a student's off-campus speech,[39] the summary-judgment

[39] The dissent erroneously contends that this court's decisions in *Sullivan v. Houston Independent School District*, 475 F.2d 1071 (5th Cir. 1973), and *Porter v. Ascension Parish School Board*, 393 F.3d 608, 615–16 n.22 (5th Cir. 2004), hold that *Tinker* applies to off-campus speech, such as Bell's.   This is a patent misreading of those decisions.   In *Sullivan,* the court did not apply the *Tinker* substantial-disruption test to assess whether school officials violated the First Amendment.   The *Sullivan* court recognized that there is nothing *per se* unreasonable about requiring a high school student to submit written material to school authorities prior to distribution on campus or resulting in a presence on campus, and that it could not be seriously urged that the school's prior submission rule is unconstitutionally vague or overbroad.   475 F.2d at 1076   (citing *Shanley*, 462 F.2d at 960; *Pervis v. LaMarque Independent Sch. Dist.*, 466 F.2d 1054 (5th Cir. 1972)).   Instead, the court held that the school principal had disciplined a student for failure to comply with the school's rules requiring prior submission to the school principal of all publications, not sponsored by the school, which were to be distributed on the campus or off campus in a manner calculated to result in their presence on the campus.   *Id.*   The student was disciplined for twice selling newspapers at the entrance of the school campus, to persons entering therein, without making prior submission of the papers, and for using profanity towards the principal ("the common Anglo-Saxon vulgarism for sexual intercourse") and in the presence of the principal's assistants   (specifically, "I don't want to go to this goddamn school anyway").   *Id.*   at 1074.   Thus, notwithstanding the *Sullivan* court's references to *Tinker* in that decision, that opinion did not apply the *Tinker* substantial-disruption test to off-campus speech.

This court in *Porter* did not hold that the *Tinker* substantial-disruption test applies to off-campus speech.   393 F.3d at 615 n.22.   The court concluded that the speech involved in *Porter*—*viz.*, a drawing depicting school violence that was inadvertently taken to campus by the student's brother—constituted off-campus speech for which the *Tinker* substantial-disruption test did not apply.   *Id.* at 615.   The court found that the circumstances involved in *Porter* were "outside the scope" of those involved in other non-Fifth Circuit cases which have held that in certain situations off-campus speech that is later brought on campus may be subject to the *Tinker* substantial-disruption analysis.   *Id.*   at 615 n.22.   In *dicta*, the court acknowledged those other cases applying *Tinker* to certain categories of off-campus speech and noted that its "analysis today is not in conflict with this body of case law."   *Id.* However, given the facts before it, the *Porter* court was not in a position to decide whether, and under what circumstances, *Tinker* applied to off-campus speech.

Thus, contrary to the dissent's assertion, the applicability of the *Tinker* substantial-disruption test to off-campus speech like Bell's remains an open question in this circuit. However, as explained herein, we need not resolve that consequential question because the School Board did not demonstrate that Bell's song caused or reasonably could have caused a substantial disruption.   In so doing, we are guided by the "'older, wiser judicial counsel 'not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.'" *Pearson v. Callahan*, 555 U.S. 223, 241 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 388

24

evidence establishes that no substantial disruption ever occurred, nor does it "demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514.   Viewing the evidence in the light most favorable to the School Board, there was no commotion, boisterous conduct, interruption of classes, or any lack of order, discipline and decorum at the school, as a result of Bell's posting of his song on the Internet.   *Cf. Shanley*, 462 F.2d at 970 ("Disruption in fact is an important element for evaluating the reasonableness of a regulation screening or punishing student expression."). Indeed, the School Board's inability to point to any evidence in the record of a disruption directly undermines its argument *and* the district court's conclusion that the summary- judgment evidence supports a finding that a substantial disruption occurred or reasonably could have been forecasted.   At the preliminary injunction hearing, Wildmon explained that his students "seem[ed] to act normal" after the posting of the song, and Rainey testified that most of the talk amongst students had not been about Bell's song but rather about his suspension and transfer to alternative school.   No evidence was offered that Bell or any other student listened to the song on campus, aside from the single instance when Wildmon had a student play the song for him on his cellphone.   The only particularized evidence [40] of a purported

---

(2007) (Breyer, J., concurring); *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)); *see also Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

[40] Defendants point to Rainey's claim that "since the song came out, students have started to mingle [in the gym]" as evidence of a substantial disruption.   However, there is no evidence that the student's mingling was improper or anything but a coincidence, nor is there evidence that such student "mingling" could reasonably be considered a substantial or material disruption.

disruption that the defendants or the district court identified as stemming from Bell's song was that Rainey and Wildmon have altered their teaching styles in order to ensure they are not perceived as engaging in inappropriate conduct with female students.[41]  However, the teachers' alteration of their teaching styles in order to avoid accusations of sexual harassment does not constitute the material and substantial disruption of school work or discipline that would justify the restriction of student speech under *Tinker*.

Furthermore, even if we were to credit the School Board's unsupported assertion that it indeed forecasted a disruption as a result of Bell's song,[42] the summary-judgment evidence nevertheless shows that there are no facts that "might reasonably have led" the School Board to make such a forecast. *Tinker*, 393 U.S. at 514.  The summary-judgment evidence conclusively shows that Bell's song was composed, recorded, and posted to the Internet entirely off campus.  School computers blocked Facebook and school policy prohibited possession of telephones, thus diminishing the likelihood that a student would access the song on campus.  Moreover, as discussed at greater length *infra*, the violent lyrics contained in Bell's song were plainly rhetorical in nature, and could not reasonably be viewed as a genuine threat to the coaches, as

---

[41] At the preliminary-injunction hearing on March 10, 2011, Superintendent McNeece, when asked directly if she was aware of any disruption, could point only to the evidence that teachers had altered their teaching style in response to Bell's song, which both Wildmon and Rainey explained was an effort to avoid any appearance of impropriety with students.  As explained herein, teachers' efforts to avoid the appearance of such improprieties does not constitute a "substantial disruption" of school work or discipline under the *Tinker* standard.

[42] Although it may not be dispositive, we observe that none of the school personnel even mentioned the term "disruption" at the January 26, 2011 Disciplinary Committee hearing; and there is no evidence reflecting that the School Board in its ruling on February 7, 2011 found that a disruption occurred or reasonably could have been forecasted as a result of Bell's song.

underscored by the Disciplinary Committee's own determination that whether Bell's song constituted a threat was "vague."

As we have emphasized, the facts simply do not support a conclusion that Bell's song led to a substantial disruption of school operations *or* that school officials reasonably could have forecasted such a disruption. Nevertheless, in support of its argument that the School Board acted in accordance with *Tinker*, the dissent relies upon the School Board's policy of classifying threats, harassment, and intimidation of teachers as a "severe disruption."[43] Under the dissent's deferential view, certain categories of speech can be "inherently disruptive" within the meaning of *Tinker* so long as school officials categorize them as such by their own *ipse dixit* (such as the School Board's "Severe Disruption" policy), thus rendering unnecessary any meaningful inquiry into whether the speech *in fact* did, or reasonably could, cause a substantial disruption as required by *Tinker*. Contrary to the dissent's argument, the School Board cannot carry its burden of demonstrating a substantial disruption or a reasonable forecast of one simply by relying on its own policy or regulation. "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." *Barnette*, 319 U.S. at 637. "The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards." *Goss*, 419 U.S. at 574. Moreover, *Tinker* held that school officials cannot circumvent their burden of showing that a

---

[43] This policy lists sixteen different "offenses" under the heading "Severe Disruptions." We note that, by its very terms, the other "offenses" qualifying as "severe disruptions" under this policy suggest that the policy relates to on-campus conduct (*e.g.,* "running in the hall," "unnecessary noise in the hall," "gambling or possession of gambling devices at school"), not to off-campus conduct, like Bell's.

No. 12-60264

substantial disruption occurred, or can be reasonably forecasted, by simply adopting a policy that categorizes certain speech as a severe or substantial disruption without any reasonable factual predicate that such speech would likely lead to substantial disruption of school work or discipline. *Tinker*, 393 U.S. at 504, 511 (holding that school officials could not adopt and enforce policy prohibiting students from wearing armbands without a showing that such regulation was necessary to avoid material or substantial disruption); *accord Shanley*, 462 F.2d at 970 ("[T]he board cannot rely on *ipse dixit* to demonstrate the 'material and substantial' interference with school discipline. Put another way, *Tinker* requires that presumably protected conduct by high school students cannot be prohibited by the school unless there are '. . . facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.'") (quoting *Tinker*, 393 U.S. at 514).

## B.

The School Board alternatively and erroneously attempts to invoke this court's decision in *Ponce v. Socorro Independent School District*, 508 F.3d 765 (5th Cir. 2007), in arguing that Bell's off-campus, but on-line, rap was not protected by the First Amendment. In *Ponce*, this court analogized to the Supreme Court's decision in *Morse*[44] and narrowly held that a student's

---

[44] In *Morse*, a high school student unfurled a 14-foot banner bearing the phrase "BONG HiTS 4 JESUS" during a school-sanctioned and supervised event. 551 U.S. at 397. The principal confiscated the banner and suspended the student. *Id.* at 398. The student filed suit under 42 U.S.C. § 1983 against the principal and the School Board, claiming that the principal's actions violated his First Amendment rights. *Id.* at 399.

The *Morse* decision resulted in a narrow holding: a public school may prohibit student speech at school or at a school-sponsored event during school hours that the school "reasonably view[s] as promoting illegal drug use." *Id.* at 408. Indeed, Justice Alito's concurrence stated that he joined the majority opinion "on the understanding that (a) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any

28

notebook which contained his plans to commit a coordinated "Columbine-style" shooting attack on his high school and other district schools was not protected by the First Amendment. *Id.* at 771 n.2. *Ponce* involved particularly egregious facts: a student brought to campus a notebook containing numerous violent and disturbing descriptions of campus violence evocative of the school shootings that have taken place across the country in recent years. We explained that we were following the lead of the Supreme Court in *Morse* in holding that such speech is not protected because it poses a direct and demonstrable threat of violence unique to the school environment. [45] Specifically, we observed: "If school administrators are permitted to prohibit student speech that advocates illegal drug use because 'illegal drug use presents a grave and in many ways unique threat to the physical safety of students,' . . . then it defies logical extrapolation to hold school administrators to a stricter standard with respect to speech that gravely and uniquely threatens violence, including massive deaths, to the school population as a whole." *Id.* at 771–772 (quoting *Morse*, 551 U.S. at 425).

Reading Justice Alito's concurring opinion, in which Justice Kennedy joined, as controlling in *Morse*, we recognized that *Morse* holds only that

restriction of speech that can plausibly be interpreted as commenting on any political or social issue." *Id.* at 422 (Alito, J., with whom Justice Kennedy joins, concurring). Justice Alito also made clear that he joined the majority only insofar as "the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions" beyond those articulated in the Supreme Court's prior student speech cases. *Id.* at 423. As made strikingly clear by Justice Alito's concurrence, *Morse* therefore in no way expands school officials' authority to restrict student speech on social or political matters; rather, the decision held only that schools have the limited authority to restrict speech at school or a school-approved event that could be reasonably viewed as promoting illegal drug use.

[45] The court observed: "Such shootings exhibit the character that the concurring opinion [in *Morse*] identifies as particular to schools. . . . This environment makes it possible for a single armed student to cause massive harm to his or her fellow students with little restraint and perhaps even less forewarning."

"speech advocating a harm that is demonstrably grave and that derives that gravity from the 'special danger' to the physical safety of students arising from the school environment is unprotected." *Id.* at 770. However, we observed that "because this is a content-based regulation, the [Alito] concurring opinion is at pains to point out that the reasoning of the court cannot be extended to other kinds of regulations of content, for permitting such content-based regulation is indeed at 'the far reaches of what the First Amendment permits.'" *Id.* (quoting *Morse*,551 U.S. at 425 (Alito, J., concurring)). As a result, we recognized, consistent with Justice Alito's concurrence, that "*Tinker's* focus on the result of speech rather than its content remains the prevailing norm." *Id.*

*Ponce* therefore narrowly extends *Morse* in holding that the *Tinker* analysis does not apply to speech brought to campus that "gravely and uniquely threatens violence, including massive deaths, to the school population as a whole." *Id.* at 772. At the same time, the *Ponce* opinion explicitly recognizes the continued applicability of the *Tinker* substantial-disruption test for most other types of on-campus speech. *Id.* at 770. Furthermore, *Ponce* also recognizes that, according to Justice Alito's controlling concurring opinion, *Morse* does not expand schools' authority to restrict on-campus speech on social or political matters. *Id.* at 769-70.

Applying these principles to the instant case, Bell's song cannot be considered to fall within the narrow exception to *Tinker* recognized by this court in *Ponce*, thus depriving his speech of First Amendment protection. As an initial matter, *Ponce* did not involve student speech occurring entirely off-campus; rather, the student in *Ponce* brought his threatening diary to campus and showed its contents to a classmate. *Id.* at 766. More importantly, however, the *Ponce* decision explicitly pivoted on the particularized and unique

threat of grave harm of mass school shootings posed by that student's private writings. *Id.* at 771.   Indeed, the student's notebook graphically detailed the group's "plan to commit a '[C]olumbine shooting' attack" at the student's school, as well as other area schools.   *Id.*   In holding such speech unprotected by the First Amendment, the court in *Ponce* emphasized that its decision was based on the fact that "the speech in question . . . is not about violence aimed at specific persons, but of violence bearing the stamp of a well-known pattern of recent historic activity: mass, systematic school-shootings in the style that has become painfully familiar in the United States." *Id.* at 770–71. In sharp contrast, Bell's song contains violent imagery typical of the hyperbolic rap genre that is "aimed at specific persons," rather than "bearing the stamp of . . . mass, systematic school-shootings."   *Id.*   Furthermore, the song amounts only to a rhetorical threat—not a genuine one—and does not come close to the catastrophic facts threatened in *Ponce*, which Judge Jolly emphasized were evocative of a "Columbine" or "Jonesboro"-style school attack.   *Id.* at 771. Indeed, Bell testified that he did not intend to threaten the two coaches with his rap song; rather, the song was meant to be an artistic expression that reflected Bell's real-life experiences and to raise awareness of an important issue of concern that he felt would be ignored by school officials.[46]   Itawamba

---

[46] We note that Bell's rap song is speech on a matter of public concern.   Speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.' " *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) (citation omitted).   The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."   *Id.* (citation omitted).   Superintendent McNeece's own testimony at the preliminary injunction hearing explicitly confirmed that the subject matter of Bell's song—male coaches' improper conduct towards female students—would be of "public importance."   We need not address the district court's disparagement of student speech on matters of public concern, as compared to adult speech on matters of public concern, *Bell*, 859 F. Supp.2d at 841, because that was part of that court's erroneous

school officials' own actions demonstrate that they did not consider Bell's song to portend violence by him personally, much less mass school shootings as dealt with in *Ponce*.   508 F.3d at 772.   For example, the Disciplinary Committee could not even conclude whether Bell's song constituted a definite threat to school officials, and there is no evidence that school officials ever contacted law enforcement regarding Bell's song.   In fact, after initially informing Bell that he was suspended pending the outcome of the disciplinary hearing, school officials did not require Bell to immediately vacate the school, and he remained in the school commons until his school bus arrived at day's end.   Moreover, any purported threat contained in Bell's song was certainly a far cry from the "'terroristic threat' to the safety and security of the students and the campus" that the school officials encountered in *Ponce*.   *Id*.   at 767.   We therefore refuse to broadly extend the holding of *Ponce* by concluding that Bell's song is the equivalent of the extremely threatening notebook created and brought to school by the student in that case.

## C.

The School Board's additional argument that Bell's rap song falls within the "true threat" exception to the First Amendment is likewise meritless.   As explained *infra*, Bell's rap was not a plainspoken threat delivered directly, privately, or seriously to the coaches but, rather, was a form of music or art broadcast in a public media to critique the coaches' misconduct and also in furtherance of Bell's musical ambitions.   Moreover, Bell's rap was not an unconditional threat that Bell himself would physically harm the coaches; at most, the song amounted to a conditional warning to them of possible harm from the female students' family members if they continued to harass the

interpretation and application of *Tinker* which we reject herein.

young women. Finally, as evidenced by the reactions of the listeners themselves, there was no reasonable or objective ground for the coaches to fear that Bell personally would harm them.

The protections that the First Amendment affords speech and expressive conduct are not absolute. *Virginia v. Black*, 538 U.S. 343, 358 (2003). The Supreme Court has long recognized that the government may regulate certain unprotected categories of expression consistent with the Constitution. *See, e.g.*, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942). One such category of unprotected speech is that which constitutes a "true threat." *Watts v. United States*, 394 U.S. 705 (1969). "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359 (citing *Watts*, 394 U.S. at 708).

In *Watts*, the petitioner was convicted of violating a 1917 statute which prohibits a person from "knowingly and willfully" making "any threat to take the life of or to inflict bodily harm upon the President of the United States." *Id. (citing* 18 U.S.C. § 871(a)). As the *Watts* Court explained:

> The incident which led to petitioner's arrest occurred on August 27, 1966, during a public rally on the Washington Monument grounds. The crowd present broke up into small discussion groups and petitioner joined a gathering scheduled to discuss police brutality. Most of those in the group were quite young, either in their teens or early twenties. Petitioner, who himself was 18 years old, entered into the discussion after one member of the group suggested that the young people present should get more education before expressing their views. According to an investigator for the Army Counter Intelligence Corps who was present, petitioner responded: 'They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. *If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.'* 'They are not going to make

33

me kill my black brothers.' On the basis of this statement, the jury found that petitioner had committed a felony by knowingly and willfully threatening the President.

*Id.* at 705–06 (emphasis added).

On petition for writ of certiorari, the Supreme Court reversed, observing that "whatever the 'willfullness' requirement [of the statute] implies, the statute initially requires the Government to prove a true 'threat.'" *Id.* at 708. The Court held that the "kind of political hyperbole" deployed by the petitioner could not qualify as a "true threat" in light of the "'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). In this regard, the Court observed that "[t]he language of the political arena, like the language used in labor disputes . . . is often vituperative, abusive, and inexact." *Id.* (citing *Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 58 (1966). The Court concluded: "We agree with petitioner that his only offense here was 'a kind of very crude offensive method of stating a political opposition to the President.' Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise." *Id.*

Applying the factors identified as instructive by the Court in *Watts—i.e.,* the context and manner of the speech, its conditional nature, and the listeners' reactions, it is clear that the rap song that Bell recorded in a professional studio and subsequently posted on the Internet in protest of what he perceived as an injustice occurring at his high school did not constitute a "true threat."

*First*, with regard to context, it is important to consider—albeit not ultimately dispositive—that the purported "threats" were contained in a rap

song, a musical genre that, like other art forms, has its own unique artistic conventions. [47]    *See Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1078 (9th Cir. 2002) ("Indeed, context is critical in a true threats case and history can give meaning to the medium."). For example, hyperbolic and violent language is a commonly used narrative device in rap, which functions to convey emotion and meaning—not to make real threats of violence. *See, e.g.*, Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Colum. J.L. & Arts 1, 22 (2007) ("Metaphor plays a critical role in rap music lyrics. . . . In rap music, metaphors not only express hope and positivity but also 'despair, stagnation, or destruction.'") (internal citation omitted). Of course, the use of violent rhetorical imagery in music is not exclusive to rap. Presumably, neither the School Board nor the dissent would believe that Johnny Cash literally "shot a man . . . just to watch him die." Nor would they likely conclude that the Dixie Chicks' hit song "Goodbye Earl" described the artists' own literal pre-meditated murder of a man using poisonous black-eyed peas, or that Bob Marley "shot the sheriff" but spared the deputy's life. Indeed, as songwriters of every genre, rap artists live through invented characters and explore roles and narrative voices, both on and offstage. [48] In addition, the context-related evidence demonstrates that Bell, as an aspiring rap musician who has been writing and recording music since his early teens,

---

[47] *See* Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Colum. J.L. & Arts 1, 20 (2007).

[48] In this regard, contrary to the dissent's argument, Bell's statement that his song reflected "real-life" experience, does not mean his lyrics are all literally true, rather than, in part, rhetorical and creative.

publicized the song not only in an effort to raise awareness of the coaches' misconduct but also to attract the attention of record labels and potential fans.

Equally important to the context of Bell's rap is the fact that it was broadcast publicly over the Internet and not conveyed privately or directly to the coaches.   Courts have recognized that statements communicated directly to the target are much more likely to constitute true threats than those, as here, communicated as part of a public protest.[49]   *Compare Watts,* 394 U.S. at 705–06 *with United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996).   The case law shows that "it makes a big difference" whether the purportedly threatening speech is "contained in a private communication—a face-to-face confrontation, a telephone call, a dead fish wrapped in newspaper—or is made during the course of public discourse.   The reason for this distinction is obvious: Private speech is aimed only at its target.   Public speech, by contrast, seeks to move public opinion and to encourage those of like mind." *Planned Parenthood of Columbia/Willamette, Inc.*, 290 F.3d at 1099 (9th Cir. 2002) (Kozinski, J. dissenting).   Indeed, as the Sixth Circuit recently observed, such contextual cues are vital in assessing whether a reasonable listener would

---

[49] In *Porter*, this circuit cited *Doe v. Pulaski County Special School District*, 306 F.3d 616 (8th Cir. 2002), in analyzing the threshold issue of the "true threat" analysis, namely: whether the purported threat was "intentionally or knowingly *communicated* to either the object of the threat or a third person."   393 F.3d at 616–17.   In *Doe*, the Eighth Circuit also listed five non-exhaustive factors relevant to the issue of how a reasonable person would receive an alleged threat.   306 F.3d at 623.   One of those factors was "whether the person who made the alleged threat communicated it directly to the object of the threat."   *Id.*   The Eighth Circuit also considered the reactions of those who heard the threat, whether the threat was conditional, whether the speaker had a history of making threats against the object of the threat, and whether the object of the threat had reason to believe that the speaker had a violent tendency.   *Id.*   We observe that all of these factors weigh in favor of the conclusion that Bell's song was not a "true threat."   For example, as explained *infra*, the warning in Bell's song was clearly conditional in nature, and there was no evidence Bell had violent tendencies or had ever threatened the coaches.

consider a statement a serious expression of an intent to cause harm: "A reasonable listener understands that a gangster growling 'I'd like to sew your mouth shut' to a recalcitrant debtor carries a different connotation from the impression left when a candidate uses those same words during a political debate. And a reasonable listener knows that the words 'I'll tear your head off' mean something different when uttered by a professional football player from when uttered by a serial killer." *United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012). Moreover, the Supreme Court has cautioned that courts should be careful to keep in mind the "public" nature of purportedly threatening speech in assessing whether it falls outside the protections of the First Amendment. *See, e.g., N.A.A.C.P.* v. *Claiborne Hardware Co.*, 458 U.S. 886, 926–27 (1982) ("Since respondents would impose liability on the basis of a public address—which predominantly contained highly charged political rhetoric lying at the core of the First Amendment—we approach this suggested basis of liability with caution.").

Likewise, in the instant case, the overall context reveals that a reasonable listener would be able to distinguish genuine threats of perpetrating school violence, like those in *Ponce*, from the purely rhetorical use of violent language contained in the lyrics of an aspiring rap musician who publicly broadcast his song, rather than privately communicated it, in an effort to (i) raise awareness of an important issue of public concern, and (ii) attract the attention of listeners and record labels in furtherance of his musical ambitions.

*Second*, the purported "threats" contained in the song are conditional in nature, as demonstrated by both the lyrics themselves and the school officials' interpretation of them. The language referencing "capping" Wildmon is conditional by its very terms: "Middle fingers up *if* you want to cap that nigga"

## No. 12-60264

(emphasis added). Moreover, one of the Disciplinary Committee members agreed with Bell that the song's lyrics regarding putting a pistol down someone's mouth conveyed that "if [the teachers] don't stop what they're doing then a parent kinda is gonna do that, not really him [*i.e.*, Bell]."

*Third and finally*, the reactions of the listeners themselves undermine the notion that a reasonable listener would view the song as a threat. For example, the Facebook screen shot indicates that Bell's Facebook "friends" who commented on the song did not view it as a threat by Bell against the coaches but rather as the product of Bell's artistic aspirations (*e.g.*, "Hey, don't forget me when you're famous" and "Lol. . . Mane Im tellin you cuz . . . been tellin you since we was little . . . keep fuckin with it man you got all the talent in the world . . ."). Moreover, the Disciplinary Committee could not even conclude whether Bell's song constituted a definitive threat, instead finding the issue "vague," and Coach Rainey himself testified that he viewed the song as "just a rap" rather than an actual threat. Even Coach Wildmon, who testified that he took the song "literally" and felt "scared," did not indicate whether he actually feared Bell, rather than the possibility that one of the female students' family members might harm him in light of the song's revelations.

As the foregoing demonstrates, the overall factual context reveals that neither the coaches, nor school officials, could have reasonably interpreted Bell's song as a serious expression of an intent to cause harm. Rather, we conclude that the violent language contained in the lyrics was clearly rhetorical in nature, and we therefore reject the argument that Bell's song constituted a "true threat" of violence.[50]

---

[50] Perhaps correctly realizing that the School Board cannot overcome the high hurdle of showing Bell's song constituted a "true threat," the dissent seeks to talismanically invoke the tragic history of mass school shootings in an effort to shield the School Board's actions from any modicum of constitutional scrutiny. We reject the dissent's overly deferential

No. 12-60264

## IV.

In conclusion, we do not decide whether the *Tinker* "substantial-disruption" test can be applied to a student's rap song that he composed, recorded and posted on the Internet while he was off campus during non-school hours. Rather, we decide only that, even assuming *arguendo* the School Board could invoke *Tinker* in this case, it would not afford the School Board a defense for its violation of Bell's First Amendment rights because the evidence does not support a finding, as would be required by *Tinker*, that Bell's song either substantially disrupted the school's work or discipline or that the school

---

approach.  Although the history of violence in schools may be a pertinent consideration in determining whether school officials acted reasonably, school officials cannot simply shirk constitutional dictates by pointing to a school tragedy each time a student sings, writes, or otherwise uses violent words or imagery outside of school.

Moreover, while conceding that Bell's song addresses a matter of public concern, the dissent does not give due consideration to the consequences on social and political discourse of reflexively deeming Bell's song a "true threat."  The genius of the First Amendment is its implicit recognition that the great diversity of our democracy yields a corresponding diversity in the creative forms of social and political debate.  *See, e.g., Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) ("Under our Constitution, esthetic and moral judgments about art and literature . . . are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority.") (internal quotation and citation omitted); *Cohen v. California,* 403 U.S. 15, 25 (1971) (observing that "one man's vulgarity is another's lyric").  A cartoon can be as powerful as a pamphlet.  *See Hustler Magazine v. Falwell*, 485 U.S. 46, 53 (1988); *accord Brown*, 131 S. Ct. at 2733 ("Like the protected books, plays, and movies that preceded them, video games communicate ideas–and even social messages–through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world).").  The most vulgar and hateful of words can be the only ones capable of conveying one's ideology.  *See Snyder*, 131 S. Ct. at 1216–17.  Within this same tradition, Bell accomplished his social critique of the coaches' harassment of female students by including vulgar and violent language in his off-campus rap recording.  *Compare Watts*, 394 U.S. at 708 ("The language of the political arena, like the language used in labor disputes . . . is often vituperative, abusive, and inexact.").  While some may prefer a socio-political landscape lacking such rhetoric, the First Amendment nevertheless protects it, and the narrow applicability of the "true threat" doctrine ensures that speech on such matters of public concern, even if vulgar or violent, is not chilled.  *See id.* at 706 (holding that petitioner's statement at a public rally that, if drafted and given a rifle, he would shoot the President was political hyperbole and not a "true threat" and was, therefore, protected by the First Amendment).

officials reasonably could have forecasted such a disruption.   With respect to the School Board's alternative argument, we conclude that Bell's song did not "gravely and uniquely threaten violence" to the school population such to justify discipline pursuant to this court's narrow holding in *Ponce* that student speech that threatened a Columbine-style attack on a school was not protected by the First Amendment.   We also conclude that Bell's speech did not constitute a "true threat," as evidenced by, *inter alia*, its public broadcast as a rap song, its conditional nature, and the reactions of its listeners.

For these reasons, the district court's judgment is REVERSED IN PART, and judgment is RENDERED in favor of Taylor Bell against the School Board on his First Amendment claim.   The case is REMANDED, and the district court is DIRECTED to award Bell nominal damages, court costs, appropriate attorneys' fees, and an injunction ordering the School Board to expunge all references to the incident at issue from Bell's school records.   In all other respects, the judgment of the district court is AFFIRMED IN PART.

No. 12-60264

RHESA HAWKINS BARKSDALE, Circuit Judge, concurring in part and dissenting in part.

The majority's long-overdue opinion (oral argument was held over two years ago, on 3 December 2012), reviews cross-motions for summary judgment. I concur, of course, in the majority's holding that the substantive-due-process claim by Taylor Bell's mother is waived and that qualified immunity precludes liability against the superintendent and principal in their individual capacities, leaving at issue only Bell's First Amendment claim against the school board. *Maj. Opn.* at 2 n.1. I must dissent, however, from the majority's both vacating the summary judgment for the school board on that claim and rendering summary judgment for Bell on it. (Assuming *arguendo* the school board is not entitled to summary judgment, Bell is not entitled to it either.) Regarding the First Amendment claim, except for the intentionally published threats to, and harassment and intimidation of, two teachers, which the school board found justified disciplinary action against Bell, I will not take issue with the majority's categorizing at 30, in note 46, the miniscule balance of Bell's incredibly violent, vulgar, and profane rap recording as involving "a matter of public concern".

"With the advent of the Internet and in the wake of school shootings at Columbine, Santee, Newtown and many others, school administrators face the daunting task of evaluating potential threats of violence and keeping their students safe without impinging on their constitutional rights." *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1064 (9th Cir. 2013). In that regard, school administrators must be afforded wide latitude in proactively addressing language that reasonably could be interpreted as a threat, harassment, or intimidation against members of the school community.

"Experience shows that schools can be places of special danger." *Morse*

41

*v. Frederick*, 551 U.S. 393, 424 (2007) (Alito, J., concurring).   For example, 11 days after oral argument in our court for this appeal on 3 December 2012, a 16-year-old entered Sandy Hook Elementary School, in Newtown, Connecticut, and shot and killed 20 school children and six staff members, including the principal, before killing himself.   In the two years since the Sandy Hook shooting, in the United States there have been 93 school shootings (defined as instances of the discharge of a firearm on campus) and 40 major school shootings (defined as an incident where the shooter was linked to the school and at least one person was shot on campus), including the most recent incidents at Florida State University, where a former student opened fire on students in the library, and at Marysville-Pilchuck High School outside Seattle, Washington, where a student killed four fellow students, before killing himself.   Greg Botelho, Faith Karimi, & Nick Valencia, *Gunman opens fire in Florida State University library; 3 wounded*, CNN, 21 Nov. 2014, available at http://www.cnn.com/2014/11/20/us/fsu-incident/; Faith Karimi & Joe Sutton, *4th Victim dies after shooting at high school cafeteria in Washington state*, CNN, 8 Nov. 2014, *available at* http://www.cnn.com/2014/11/08/us/washington -school-shooting/index.html; Matt Kreamer, *2 dead, 4 wounded in shooting at Marysville-Pilchuck High School*, The Seattle Times, 24 Oct. 2014, *available at* http://blogs.seattletimes.com/today/2014/10/shooting-reported-at-Marysville-pilchuck-high-school/; *School Shootings in America Since Sandy Hook*, We Are Everytown for Gun Safety (3 Dec. 2014), http://everytown.org/article/schoolshootings/; *see also Spinning Statistics on School Shootings*, FactCheck.org (25 June 2014), http://www.factcheck.org/2014/06/spinning-statistics-on-school-shootings/.

Tragically, this post-oral-argument school-related violence is consistent with the increasing school-related violence prior to the date of oral argument

here.   From 19 February 1997 (the day a 16-year old shot and killed a student and principal, and injured two others in Bethel, Alaska) to the date the school board found against Bell on 7 February 2011, there were 171 school shootings (including those in Pearl, Mississippi, Littleton, Colorado (Columbine), and Blacksburg, Virginia (Virginia Tech)).   *Major School Shootings in the United States Since 1997*, Brady Campaign to Prevent Gun Violence (17 Dec. 2012), http://gunviolence.issuelab.org/resource/major_school_schootings_in_the_United_States_since_1997.   For example, on 6 February 2011, the day before the school-board meeting concerning Bell, one student was killed and 11 others were injured during a shooting at Youngstown State University in Ohio.   *Id.*

As evidence of this disturbing trend of school violence, each State in our circuit has passed legislation addressing such violence since the Sandy Hook shooting. *See* Nathan Koppel, *More Texas Schools Allow Armed Employees*, Wall Street Journal, 25 Aug. 2014, *available at* http://online.wsj.com/articles/more-texas-schools-allow-armed-employees-1408986620.   Louisiana has passed legislation changing/expanding emergency preparedness drills; Mississippi and Texas have passed legislation allowing the addition of school police or security officers; and Texas has also passed legislation allowing certain personnel to carry firearms on school grounds, and authorizing state-funded school safety centers. *Id.*   Symptomatic of how commonplace violence at schools has become, six States "mandate **active shooter drills for schools**", designed to simulate mass shooting situations, while 24 States "**requir[e] general school lockdown or safety drills**".   Dan Frosch, *'Active Shooter' Drills Spark Raft of Legal Complaints*, Wall Street Journal, 4 Sept. 2014, *available at* http://online.wsj.com/articles/active-shooter-drills-spark-raft-of-legal-complaints-1409760255.

No. 12-60264

Meanwhile, nearly all teenagers use the Internet, with the majority of them accessing it and social-networking websites through mobile devices. Amanda Lenhart, Presentation, PewResearch Internet Project, *Teens & Technology: Understanding the Digital Landscape* (25 Feb. 2014), http://www.pewinternet.org/2014/02/25/teens-technology-understanding-the-digital-landscape/ (explaining 95 percent of teenagers use the Internet and 74 percent of teenagers between 12 and 17 years old are mobile Internet users); *see also* Amanda Lenhart, Presentation PewResearch Internet Project, *It Ain't Heavy, It's My Smartphone: American Teens & The Infiltration Of Mobility Into Their Computing Lives* (14 June 2012), http://www.pewinternet.org/2012/06/14/it-aint-heavy-its-my-smartphone-american-teens-and-the-infiltration-of-mobility-into-their-computing-lives/ (explaining, as of 2012, 80 percent of teenagers used social-networking websites). Commonly used social-media websites include Facebook (provides a litany of social services such as "news feed", personalized "profile" and instant-messaging), Twitter (allows users to "tweet" statements up to 140 characters, and view others' "tweets", in personalized feed), Instagram (allows users to post, and view others', pictures, in personalized feed), Snapchat (allows users to send personalized pictures to others while limiting time users may view an image), and Pinterest (allows users to post and group pictures or webpages to their profile). As a result of this "near-constant student access to social networking sites on and off campus, when offensive and malicious speech is directed at school officials and disseminated online to the student body, it is reasonable" for school officials to foresee a substantial disruption to the school environment. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 950 (3d Cir. 2011) (Fisher, J., dissenting).

"[A] page of history is worth a volume of logic". *N.Y. Trust Co. v. Eisner*,

256 U.S. 345, 349 (1921) (Holmes, J.); *see also* Oliver Wendell Holmes, Jr., The Common Law 5 (1881) ("The life of the law has not been logic: it has been experience."). In the light of such use of social media by students and the oft-repeated school violence before and after the school board's finding against Bell, school administrators must remain vigilant as they seek to prevent violence against students and faculty. As part of this vigilance, they must take seriously any statements by students resembling threats of violence, as well as intimidation and harassment by them. Long ago, Justice Jackson warned: "There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact". *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting). That warning applies to the result-driven majority opinion.

Throughout its opinion, the majority attempts to camouflage Bell's threats, intimidation, and harassment under the guise of "rap music". For this red herring, in classifying Bell as an "aspiring rap musician", *e.g.*, at 3, 34, 35, and note 21 at 7, the majority hopes characterizations and euphemistic descriptions will distract from the patent seriousness of Bell's aggressive and dangerous comments. Whether Bell was "rapping", singing country music, or reading poetry is immaterial; he threatened, intimidated, and harassed two teachers. At issue is the message, not the medium.

Regrettably, although the majority pays lip service to the increasing danger in schools, it then sanctions the threats, harassment, and intimidation in the rap recording, including by turning its back on the deference that must be accorded school administrators in dealing with such serious matters. Among other threatening, harassing, and intimidating statements, Bell's rap recording includes: "I'm going to hit you with my [R]ueger [sic]"(referring to

45

a firearm manufactured by Sturm, Ruger & Co.), "going to get a pistol down your mouth /Boww" (or "Pow"), and "middle fingers up if you want to cap that nigga" ("cap" is slang for "shoot").   To hold, as the majority does, that these and similar statements in the rap recording are protected speech is beyond comprehension.   With due deference, the majority's holding is absurd.   This cannot be the law.

## I.

A correct recitation of the underlying facts, from the summary-judgment record, is especially important for this appeal.   The majority opinion fails in that regard.   For example, it often states that Bell "testified", without specifying whether it was during the disciplinary-committee hearing (at which his informal comments were not under oath) or at the hearing on his request for a preliminary injunction.   *E.g.*, *Maj. Opn.* at 3, 8, 9, and in note 3 at 3.

Bell posted the rap recording on 5 January 2011 to his public Facebook page, using what appears to be a representation of a Native American as the rap recording's cover image.   (The Itawamba Agricultural High School mascot is a Native American.)   A screenshot of Bell's Facebook profile, taken approximately 16 hours after he posted the rap recording, shows his profile, including the rap recording, was open to, and viewable by, the public.   In other words, anyone could access and listen to the rap recording.

Additionally, although the majority claims at 7, in note 21, that there is no evidence identifying Bell's Facebook "friends", or whether any attended his school, when viewing a person's profile, Facebook shows ten randomly selected friends.   In this instance, three of those friends were self-identified members of the Itawamba school district.

The following school day, on 6 January, Coach W. received a text message from his wife, asking about the rap recording; she had learned about

it from a friend. The coach listened to the rap recording at school, using a student's cellular telephone, which had access to the Internet. The coach immediately reported the rap recording to the school's principal, Wiygul, who then informed McNeece, the school-district superintendent.

On 7 January, Wiygul, McNeece, and Floyd (the school-board attorney) questioned Bell about the rap recording and its accusations, after which Bell was sent home for the remainder of the day. Because of snow days, the school was closed through 13 January.

During his time away from school, and to give far wider dissemination of his rap recording, Bell created a finalized version of it (adding commentary and a picture slideshow), and uploaded it to YouTube, again making the rap recording available to the public.

Bell returned to school on 14 January, but was removed from class midday by the assistant principal and told he was suspended, pending a disciplinary-committee hearing (school officials permitted him to remain in the school commons until the school bus he rode arrived at the end of the day). By letter that same day to Bell's mother, the school-district superintendent (McNeece) informed her a hearing would be held on 19 January to consider disciplinary action for Bell's "alleged threatening intimidation and/or harassment of one or more school teachers". In the letter, McNeece explained Bell's suspension would continue until further notification, and informed his mother of the possible actions the school board could take.

In an 18 January telephone conversation with the school-board attorney, Bell's mother requested Bell's hearing be continued until 26 January. The school-board attorney re-set the hearing for the requested date.

The disciplinary-committee hearing was held 26 January. Although there is no transcript of the hearing, the recording of it is included in the

summary-judgment record. The information contained in the disciplinary-committee-hearing recording more than justified the subsequent action taken by the school board. The disciplinary-committee-hearing recording is the critical evidence at hand, making it necessary to describe the contained information in great detail.

The hearing was facilitated by Floyd, the school-board attorney; three disciplinary-committee members were present, as well as the principal, Bell, his mother, and their attorney. The school-board attorney began by addressing the informal nature of the hearing. And, throughout the hearing, the school-board attorney emphasized the issue before the committee was whether Bell threatened, harassed, and/or intimidated school personnel and whether he should be disciplined as a result. The school-board attorney explained that the allegations against the two coaches would be the subject of another proceeding. (The majority fails at 10, in note 25, to include this explanation in its discussion of Bell's attorney's attempting, at the disciplinary-committee hearing, to inject students' allegations against the coaches.)

Wiygul, the principal, stated: Coach W. came into his office, explaining "several kids" were talking about a rap recording Bell had posted on Facebook, which was derogatory toward him and another coach, and accused them of inappropriate conduct; the following morning, Bell was brought into a meeting and asked about his accusations, but would not talk about them; at that time, school officials decided it was best to send Bell home for the remainder of the day; and Bell came to school the next school day (which, due to snow, was the following Friday), but the assistant principal told him to leave as he was suspended pending a hearing.

After Wiygul spoke, the YouTube version of the rap recording was played

at the hearing.

Bell and his mother then stated that he was not told of the suspension until Friday (14 January), when the assistant principal saw Bell and contacted McNeece, the school-district superintendent, asking her what to do about Bell's presence. According to them, McNeece first instructed the assistant principal that Bell could stay, but then instructed him to tell Bell to leave and not come back.

Bell's attorney then began asking who decided on the temporary suspension and the reason for that decision. Floyd, the school-board attorney, redirected the discussion, explaining the purpose of the hearing was to determine whether the suspension should be upheld, and whether the allegations that Bell threatened, harassed, and intimidated teachers were correct.

One of the committee members asked Bell if he had spoken to anyone at the school about the accusations he made in the rap recording. Bell explained he did not speak to anyone about those accusations, but instead made the rap recording because he knew people were "gonna listen to it, somebody's gonna listen to it". (Several times during the hearing Bell acknowledged he posted the rap recording to Facebook because he knew it would be viewed and heard by students. Moreover, he explained that at least 2,000 people contacted him about the rap recording in response to the Facebook and YouTube postings.)

Although Bell's attorney tried to begin discussing the misconduct of the coaches alleged in the rap recording, the school-board attorney again redirected the conversation to the purpose of the hearing, which was, as she explained, to discuss the "comments made . . . the 'you've f—ed with the wrong one / going to get a pistol down your mouth / POW' [because] those are threats to a teacher".

No. 12-60264

Bell responded by stating, "Well that ain't really what I said", and then provided what he described as the "original copy". (It is unclear from the disciplinary-committee-hearing recording, or other parts of the summary-judgment record, which copy of the rap item Bell provided.   There are three written versions of the rap item in the record.   The first was submitted as an exhibit by the school board with its response in opposition to Bell's motion for a preliminary injunction and used the word "ruler", instead of "rueger [sic]", following "I'm going to hit you with my. . .".   The other two versions were exhibits introduced at the preliminary-injunction hearing.   The second version was submitted by Bell and used the word "rueger [sic]".   The third version is hand-written excerpts, submitted by the school board.   During the preliminary-injunction hearing, the school board stipulated to the accuracy of Bell's transcription.   Finally, the "rueger [sic]" and "ruler" versions were both re-submitted as exhibits with the cross-motions for summary judgment. The "rueger [sic]" version was submitted with Bell's motion for summary judgment as an exhibit, and the "ruler" version was submitted with the school-board's motion.)

Bell explained he did not mean *he* was going to shoot anyone, but that he was only "foreshadowing something that might happen".   Nevertheless, Bell acknowledged that "certain statements" were made to his mother that "'put a pistol down your mouth'[,] that is a direct threat".   Floyd, the school-board attorney, clarified for the record, and the mother agreed, that no one at the hearing made those statements to Bell's mother.   Rather, those statements were made "outside the school setting".

One of the committee members asked Bell why he had posted a new version of the rap recording on YouTube after school officials had approached him about his posting the rap recording on Facebook.   Bell gave a few (and

50

somewhat conflicting) explanations:   the version he posted on Facebook was a raw copy, so he wanted a finalized version posted on YouTube; the Facebook version was posted for his friends and "people locally" to hear, whereas the YouTube version was for music labels to hear; and he posted the YouTube version with a slideshow of pictures to help better explain what the rap recording was about because people had been asking him about it (the Facebook version only included a brief explanation of the backstory in the caption to the rap recording).

Near the end of the disciplinary-committee hearing, Bell explained again that:   he put the rap recording on Facebook and YouTube knowing it was *open to public viewing*; part of his motivation was to "increase awareness of the situation"; and, although he did not think the coaches would hear the rap recording and did not intend the rap recording to be a threat, he knew students would listen to the rap recording, later stating "students all have Facebook".

Throughout the hearing, the school-board attorney and committee members were very considerate toward Bell and counseled him on what appropriate action he could have taken.  (Amazingly, one member even told Bell that he "really can rap" and explained there would have been no problem with the rap recording or its vulgar language if it had not included threats against school employees.   The majority claims at 12, in note 29, that this committee member did not characterize Bell's statements as "threatening", and only admonished Bell for his word choice, "thus providing Bell poetic or artistic advice".   Given that the disciplinary committee found Bell harassed and intimidated the coaches, while finding it was vague whether he threatened them, this distinction by the majority is wide of the mark.   It is consistent with the majority's going to any extreme to avoid the obvious:    that Bell threatened, intimidated, and harassed two teachers.)   At the close of the disciplinary-

committee hearing, the school-board attorney emphasized, and Bell's attorney did not contest, that by posting the rap recording to an *open* Facebook page, Bell knew anyone could hear the rap recording.

By 27 January letter to Bell's mother, the school-board attorney advised: the disciplinary committee had determined "the issue of whether or not lyrics published by Taylor Bell constituted threats to school district teachers was vague", but that the publication of the rap recording constituted harassment and intimidation of two teachers, in violation of school-board policy and state law; as a result, the disciplinary committee recommended Bell's seven-day suspension be upheld and that he be placed in the county's alternative school for the remainder of the nine-week grading period; Bell would not be "allowed to attend any school functions and [would] be subject to all rules imposed by the Alternative School";   and "[he would] be given time to make up any work missed while suspended or otherwise receive a 0, pursuant to Board policy".

By 1 February letter, the school-board attorney confirmed to Bell's attorney the content of their 31 January conversation, during which Bell's attorney had stated:   Bell wished to appeal the disciplinary-committee's recommendation; and Bell and his mother were expected to appear before the board on 7 February without counsel, because their attorney was unable to attend due to a scheduling conflict.   The letter advised that, despite the recommendation that Bell begin alternative school on 27 January, he had not attended any classes and explained these absences would add to the length of time before he would be allowed to return to a regular classroom.

The only document in the record from the 7 February school-board meeting is the minutes of that meeting.   They state:   "Chairman Tony Wallace entertained a motion by Clara Brown to accept the discipline recommendation of the discipline committee regarding student with MSIS

#000252815 (I.A.H.S.) and finding that this student threatened, harassed and intimidated school employees. Wes Pitts seconded the motion. Motion Carried Unanimously." (Subsequently, at the 10 March preliminary-injunction hearing, the school-board attorney testified that, at the 7 February school-board meeting, the board listened to a recitation of Bell's rap item.

The majority at 13, note 32, states the "record is unclear regarding the exact evidence presented to the School Board", but that the "Board's decision apparently was based on the same audio-recording of Bell's song heard by the Disciplinary Committee". The record is not "unclear". During the preliminary injunction hearing, the school-district's attorney asked McNeece, the school-district superintendent, "[T]he two lyrics that I've read into the record and these witnesses have read into the record, were presented to the school board, correct?", to which McNeece replied, "That's correct." Portions of the rap item read into the record include: "[G]oing to get a pistol down your mouth" and "Middle fingers up, if you want to cap that nigga". Therefore, it is not unclear what the school board considered. Furthermore, at the beginning of the preliminary-injunction hearing, Bell's attorney submitted as evidence the transcription of the rap item. As discussed *supra*, at that hearing, the school board accepted this transcription as "the correct version".)

By 11 February letter to Bell's mother, the school-board attorney explained that, contrary to the earlier-described lesser findings of the disciplinary committee (Bell had harassed and intimidated two teachers; but, whether he had made a threat was "vague"), the school board had determined: "Bell did threaten, harass and intimidate school employees in violation of School Board policy and Mississippi State Law". (According to the written school policy, "[h]arassment, intimidation, or threatening other students and/or teachers" constitutes a "severe disruption".) Notwithstanding the

53

school board's determining Bell had engaged in conduct even more serious than that found by the disciplinary committee, the school board upheld the recommendations of the disciplinary committee.

On 24 February, Bell and his mother filed this action, claiming the school board, superintendent, and principal, *inter alia*, violated Bell's First Amendment rights. Plaintiffs moved for a preliminary injunction on 2 March, seeking Bell's immediate reinstatement to his high school, including the reinstatement of "all privileges to which he was and may be entitled as if no disciplinary action had been imposed", and that all references to this incident be expunged from his school records.

For the earlier-referenced 10 March hearing on the preliminary-injunction request, Bell included four affidavits from students at his school, containing allegations against the coaches. (The affidavits were not considered by the district court during the preliminary-injunction hearing.)

At the hearing, the superintendent testified that she had attended the school-board meeting at which Bell's rap item was presented; and that there was a foreseeable danger of substantial disruption at the school as a result of the rap recording.

Both coaches accused and threatened in the rap recording testified at the preliminary-injunction hearing; each explained the rap recording affected their work at the school. Coach R. testified that, subsequent to the publication of the rap recording, students began spending more time in the gym, despite teachers telling them to remain in classrooms; and Coach W. testified that he interpreted the words in the rap recording literally and was frightened. (The majority at 24–25, in note 41, disputes the nature of the testimony by claiming the only evidence of a substantial disruption was the coaches' alteration of their teaching styles "to avoid any appearance of impropriety", and, at 36,

54

seeks to diminish the importance of the testimony by stating Coach W. "did not indicate whether he actually feared Bell, rather than the possibility that one of the female students' family members might harm him in light of the song's revelations". This is incorrect. For example, as the majority admits at 14–15, Coach W. testified that, in addition to being frightened by the rap recording, he did not allow the members of the school basketball team he coached to leave after games until he was in his vehicle. Moreover, Coach W.'s testimony provides valuable insight into how an objectively reasonable person would interpret the threats in the recording.) At the hearing, the district court refused to entertain questioning on whether the allegations against the two coaches were true. After finding Bell's last day of alternative school would be the next day, 11 March, the district court ruled the issue was moot and denied the preliminary injunction.

On cross-motions for summary judgment, the district court denied Bell's motion and granted defendants' (the school board, superintendent, and principal). In doing so, it ruled the rap recording constituted "harassment and intimidation of teachers and possible threats against teachers and threatened, harassed, and intimidated school employees". *Bell v. Itawamba Cnty. Sch. Bd.*, No. 1-11-CV-56, order at 9 (N.D. Miss. 15 Mar. 2012). The court also held the rap recording "in fact caused a material and/or substantial disruption at school and . . . it was reasonably foreseeable to school officials the song would cause such a disruption". *Id.* Moreover, the court held: (1) the individual defendants were entitled to qualified immunity; and (2) Bell's mother could not show a violation of her Fourteenth Amendment rights. *Id.* at 12.

## II.

As discussed above, the majority affirms these last two holdings. I dissent only from its (1) vacating the summary judgment granted the school

board on Bell's First Amendment claim and (2) rendering judgment for him on that claim.   The judgment awarded the school board on the First Amendment claim should be affirmed.   In the alternative, that claim should be remanded to district court for trial.

A summary judgment is reviewed *de novo*, applying the same standard as did the district court.   *E.g.*, *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (citation omitted).   Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law".   Fed. R. Civ. P. 56(a).   "A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and a fact is material if it might affect the outcome of the suit."   *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (internal citation and quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In determining whether to grant summary judgment, the court, in its *de novo* review, views the evidence in the light most favorable to the non-movant. *E.g.*, *Dameware Dev., LLC v. Am. Gen. Life Ins. Co.*, 688 F.3d 203, 206–07 (5th Cir. 2012) (citation omitted).   Consistent with that, when, as here, cross-motions for summary judgment are in play, "we review [*de novo*] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party".   *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001)). "Although on summary judgment the record is reviewed *de novo*, this court . . . will not consider evidence . . . not presented to the district court", but "we may affirm the . . . decision on any basis presented to the district court".   *Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013)

(citations and internal quotation marks omitted).

The summary-judgment record at hand includes, *inter alia*: (1) affidavits of four students regarding the coaches' supposed conduct; (2) screenshots of Bell's Facebook page; (3) a transcription of the rap item submitted by the school board ("ruler" version); (4) a transcription of the rap item submitted by Bell ("rueger [sic]" version); (5) the letter from the superintendent to Bell's mother informing the Bells of a hearing before the disciplinary committee; (6) the digital recording of the rap recording; (7) the first screenshot of Bell's Facebook "wall"; (8) the second screenshot of Bell's Facebook "wall"; (9) the disciplinary-committee's findings; (10) the disciplinary-committee-hearing minutes and the all-important CD recording of that hearing; (11) the school-board attorney's letter to Bell's mother informing her of the disciplinary-committee's findings; (12) the school-board-hearing minutes; (13) the school-district discipline policy; (14) the school-board attorney's letter to Bell's mother informing her of the school-board's determination; and (15) the transcript of the preliminary-injunction hearing.

For obvious reasons, in analyzing school-board decisions, deference must be accorded the school-board's determinations. *Callahan v. Price*, 505 F.2d 83, 87 (5th Cir. 1974); *see also Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion."), *overruled on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Shanley v. Northeast Indep. Sch. Dist.*, 462 F.2d 960, 967 (5th Cir. 1972) (citing cases) ("That courts should not interfere with the day-to-day operations of schools is a platitudinous but eminently sound maxim which this court has reaffirmed on many occasions.").

**A.**

No. 12-60264

It is well-established that students do not forfeit their First Amendment rights to freedom of speech and expression when they enter school.  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).   The First Amendment does not, however, guarantee students absolute rights to such freedoms.   As Justice Oliver Wendell Holmes, Jr., wrote nearly a century ago: "[T]he character of every act depends upon the circumstances in which it is done.   The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck v. United States*, 249 U.S. 47, 52 (1919) (citation omitted).   Bell's rap recording, through which the school board found he threatened, intimidated, and harassed two members of the faculty at his high school, was intentionally disseminated through Facebook and YouTube.   Accordingly, on two bases (true threat and substantial disruption), the threatening, harassing, and intimidating portions of Bell's incredibly violent, vulgar, and profane rap recording do not enjoy the protection of the First Amendment.

### 1.

The school-board's decision should be upheld under the "true threat" analysis originally introduced in *Watts v. United States*, 394 U.S. 705 (1969). Although the First Amendment generally protects speech, "the government can proscribe a true threat of violence without offending the First Amendment". *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616 (5th Cir. 2004).   "[A] prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur'". *Virginia v. Black*, 538 U.S. 343, 360 (2003) (alteration in original) (quoting *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992)).   "Speech is a true threat and therefore unprotected if an objectively reasonable person would interpret

the speech as a serious expression of an intent to cause a present or future harm." *Porter*, 393 F.3d at 616 (citation and internal quotation marks omitted). Moreover, intimidation is a form of true threat. *See Black*, 538 U.S. at 360 ("Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.").

The true-threat analysis was further explained in *Doe v. Pulaski County Special School District*, which provided a two-step test:   (1) whether the speaker "intentionally or knowingly communicated the statement in question to someone" including "a third party"; and (2) "whether a reasonable person would interpret the purported threat as a serious expression of an intent to cause a present or future harm".   306 F.3d 616, 622, 624 (8th Cir. 2002) (en banc).   Our court affirmatively cited *Doe* as an "illustrative application" of the true-threat test in the context of school speech.   *Porter*, 393 F.3d at 616–18 (finding off-campus speech at issue not intentionally communicated to anyone). In our *de novo* review of the cross-motions for summary judgment, the question then becomes whether, pursuant to the standard set by Rule 56(a), each prong of the two-step test is satisfied.

**a.**

Regarding the first step, and contrary to the position taken by the majority, there is no genuine dispute that Bell intentionally and knowingly communicated the rap recording in a way that it would reach the school.   Bell first posted the rap recording to his *open* Facebook account, accessible to anyone with a Facebook account, and not limited to his Facebook 1,380-member "friend" group.   At the disciplinary-committee hearing, he stated he knew "students and stuff would hear it because . . . students all have Facebook".   And, Bell posted a revised version of the rap recording to

YouTube, which offers unlimited access.    When asked at the disciplinary-committee hearing why he did not discuss his allegations with the school principal, he stated that such conversations would have no impact, but "[i]f I do the song, they're going to listen to it".    It is undisputed that Bell intentionally targeted the rap recording to students and administrators alike, hoping the latter would take action after hearing the recording.

**b.**

The next question in this two-step analysis is whether a *reasonable* person would view the threatening speech as "an intent to cause a present or future threat".    *Doe*, 306 F.3d at 622.    This is an issue of law.    *See generally id.* at 616–26 (rendering judgment as a matter of law, holding as objectively reasonable the determination that the threat constituted a "true threat").

As stated, there can be no question that an objectively reasonable person would interpret the rap recording as a true threat.    When a student intentionally and publicly states that an educator will be "capped" (shot), have a pistol put down his mouth, and hit with a pistol, an objectively reasonable school administrator may interpret these words to constitute a true threat. "School administrators must be permitted to react quickly and decisively to address a threat of physical violence . . . without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance."    *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 772 (5th Cir. 2007).

Supporting how an objectively reasonable person would view the comments, Coach W. testified at the preliminary-injunction hearing that he took the rap recording "literally", felt "scared", reported the rap recording to the principal immediately upon hearing it, and took extra safety measures after hearing the rap recording.    Consistent with that testimony, Bell's expert

witness in the field of rapping testified at the preliminary-injunction hearing that, if a rap item names an individual directly preceding a threat, "it would definitely be cause for conversation with the [rapper], absolutely". And, as discussed earlier, Bell's mother even received comments from community members (outside the school setting) who had heard the rap recording and believed the language about putting a pistol down someone's mouth would constitute a direct threat. After listening to the statements in the rap recording, the school board determined unanimously "that [Bell] did threaten, harass, and intimidate school employees". Therefore, the rap recording was understood, both subjectively by one of the coaches and objectively by the school board, to be a threat.

Bell implores this court to interpret his threats as simply artistic expression. The majority, likewise, contends at 33 and 35 that, because Bell's threats were embedded in some protected speech, his threats were at worst hyperbolic or metaphoric and that such speech does not constitute a true threat. But the nature of the speech and Bell's own admissions belie this contention. As discussed *supra*, in the written version of the rap recording relied upon by Bell, he threatened, *inter alia*, to "hit [a coach] with *my rueger* [sic]", referring, as noted *supra*, to the firearms manufacturer Sturm, Ruger & Co. (Emphasis added.) In the YouTube version, Bell also stated he was writing about "real-life experience". By his own admission, then, not all of the rap recording was meant to be rhetorical; instead, Bell urges only the portions involving threats, harassment, and intimidation fit that category.

Regardless, under the true-threat analysis, whether Bell *intended* the rap recording to be taken as a threat is immaterial. *Porter*, 393 F.3d at 616. The same is true for whether he was capable of carrying out the threat. *Id.* at 616 n.25 (discussing *Doe*'s instruction to disregard subjective ability to carry

61

out threat).    The school board determined unanimously that the rap recording threatened, harassed, and intimidated the coaches.    Accordingly, Bell was suspended for Offense 16 (threatening, harassing, and intimidating) of the severe-disruptions section of the school-district disciplinary policy, and in violation of state law. (Two potential state-law examples, among many, are Mississippi Code Annotated § 37-11-21 (making it a misdemeanor to abuse teachers) and § 97-45-17 (making it a felony to post messages through electronic media for the purpose of causing an injury to another).)

Incredibly, the majority seems to believe that making such threats in a rap recording obscures the fact that Bell's words could reasonably be considered to place two members of the school's faculty in danger, and that taking disciplinary action against him for such conduct violates his First Amendment rights.    But, again, "rapping" has nothing to do with this; a student who speaks the words Bell spoke, regardless of the manner of speech, threatens teachers.    The majority at 10–11, and in note 27, urges that, by Bell's stating he was writing about real-life, he was referring to his personal experiences at school regarding the allegations about the coaches, and that his "real-life" statement should not be construed to imply a serious intent to carry out the threats in his recording.    Again, the public-school system "relies necessarily upon the discretion and judgment of school administrators and school board members". *Wood*, 420 U.S. at 326.    Therefore, as noted *supra*, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion".    *Id.*; *see also Morse*, 551 U.S. at 425 (Alito, J., concurring) ("[D]ue to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence".).

The majority at 34, in note 49, emphasizes that, based on numerous

factors such as the claimed indirect and allegedly conditional nature of the threat, and the claimed lack of evidence demonstrating a violent predisposition, Bell's speech could not have been considered a true threat as a matter of law.   The question is not which interpretation is more reasonable; rather, it is whether an objectively reasonable person could interpret the speech as a true threat.   (Along that line, and as the summary-judgment evidence demonstrates, Coach W., the school board, and other members in the community who contacted Bell's mother understood the speech to be a threat.)

The majority at 37, in note 50, accuses this dissent of failing to give "due consideration to the consequences on social and political discourse" by this dissent's labeling Bell's speech a "true threat".   The majority equates Bell's threats to other forms of pure political speech and, relying on the facts of *Watts*, claims Bell's speech could not have reasonably been interpreted as a true threat.   (At 33–34, in an absurd metaphor, the majority claims that no reasonable person would conclude performers murdered, or intended to murder, the characters in their well-known songs based on their lyrics. Needless to say, those songs involved fictional characters, not real-life educators during an extremely tragic period of school violence in this Nation's history.   This comparison by the majority conveys an attitude that not only ignores this tragic period but also reflects an almost callous indifference toward it.)

Further, the majority glosses over the stark differences between this case and *Watts*.   In *Watts*, at a Vietnam War protest rally, the speaker made, for effect, hyperbolic "threats" against the President, stating, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."   394 U.S. at 706.   Here, unlike in *Watts*, and according to his rap recording, Bell knew these coaches, and interacted with, and had access to, them as a student.

63

Additionally, Bell did not speak abstractly; rather, he advocated their being killed with a specific brand of gun, and in a specific way. Bell's access to the coaches, and the specificity with which he threatened, intimidated, and harassed them, mandate an outcome different from that reached by the majority. As discussed, the First Amendment must give way in the face of speech reasonably interpreted as imminent threats of danger.

Finally, this court should be even more reluctant to overrule the judgment of school officials in the light of the above-described, widespread gun violence throughout our Nation. Combining Bell's intentional communication of the rap recording toward students and administrators with the school board's objective determination that Bell threatened, harassed, and intimidated two teachers, there is no genuine dispute that Bell's threats satisfy the true-threat test and, therefore, are unprotected speech.–

**2.**

In the alternative, and pursuant to the *Tinker* "substantial-disruption" test, the school-board's decision did not violate Bell's First Amendment rights. In general, our court applies the *Tinker* analysis to "school regulations directed at specific student viewpoints". *Porter*, 393 F.3d at 615; *see also Wynar*, 728 F.3d at 1069 ("[W]hen faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of *Tinker*."); *Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 38 (2d Cir. 2007); *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 982–83 (11th Cir. 2007) (analyzing threats of violence to individual teachers under *Tinker*). *Tinker* allows a school board to discipline a student for speech that either causes a substantial disruption or *is reasonably forecast to cause one.* 393 U.S. at 514. In that regard, as discussed, judicial review is necessarily deferential: "School administrators

must be permitted to react quickly and decisively to address a threat of physical violence . . . without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance".  *Ponce*, 508 F.3d at 772.

The majority contends the rap recording is "off-campus" speech, noting throughout its recitation of the facts that, *inter alia*, Bell composed, recorded, and uploaded the recording off-campus.  Even assuming the "on-campus/off-campus" distinction remains relevant today (it does not, as discussed *infra*), Bell's intent for the speech to reach members of the community (admitted by Bell at the disciplinary-committee hearing and recognized by the majority at 4), evinced by his posting the recording publicly to Facebook and YouTube, makes Bell's speech the functional equivalent of on-campus speech.  Treating it otherwise is a classic, and forbidden, elevation of form over substance.

Notwithstanding its *assuming* the *Tinker* test applies in this instance, the majority claims at 22–23, in notes 37 and 38, that our precedent only leaves open the possibility of applying *Tinker* to off-campus speech.  But, contrary to the majority's understanding, this is not an open issue: our court has applied *Tinker* to off-campus speech when, as in this instance, the speech reached the school.  In a post-*Tinker* decision, *Sullivan v. Houston Independent School District*, our court held that, where a student sold vulgar newspapers off-campus, defendant's "conduct . . . outweigh[ed] his claim of First Amendment protection".  475 F.2d 1071, 1075 (5th Cir. 1973) ("This case arises from the unauthorized distribution of an underground newspaper *near a high school campus*, and presents the now-familiar clash between claims of First Amendment protection on the one hand and the interests of school boards in maintaining an atmosphere in the public schools conducive to learning, on the other." (emphasis added)).  Our court reasoned:  "In the years since *Tinker*

65

was decided courts have refused to accord constitutional protection to the actions of students who blatantly and deliberately flout school regulations and defy school authorities", proceeding to cite numerous cases applying *Tinker* to similar speech.   *Id.* at 1076.   Although the court was careful to emphasize the reasonable responses of the school and the unhelpful conduct by defendant in the face of such responses, the court also emphasized defendant's "conduct [could] hardly be characterized as the pristine, passive acts of protest 'akin to pure speech' involved in *Tinker*".   *Id.* (citation omitted).

Likewise, the contrast here could not be greater.   Bell's rap recording is so far removed from the armbands worn in *Tinker*, protesting the war in Vietnam, that his seeking protection under the First Amendment, based on the test in *Tinker*, borders on being frivolous.   Consistent with Justice Black's warning in *Tinker*, the majority's allowing Bell to threaten, intimidate, and harass two teachers, by holding the comments are protected speech, signals a "revolutionary era of permissiveness in this country fostered by the judiciary". *Tinker*, 393 U.S. at 518 (Black, J., dissenting).

Further, our court's decision in 2004 in *Porter* supports this conclusion. The *Porter* court, in noting other circuits' application of *Tinker* to off-campus activities, interpreted *Sullivan* as applying *Tinker* to off-campus speech.   393 F.3d at 615 n.22, 619 n.40 (stating "a number of courts have applied the test in *Tinker* when analyzing off-campus speech brought onto the school campus", citing *Sullivan*).

The majority at 23, in note 39, accuses this dissent of "patent[ly] misreading" *Sullivan* and *Porter*.   In a footnote devoid of any relevant legal analysis, the majority not only intentionally ignores *Sullivan*'s reliance on *Tinker* in reaching its conclusion, but implies the court made an *ad hoc* decision.   By determining the school's prior-approval regulation was

constitutional, the *Sullivan* court concluded that *Tinker* applies to off-campus speech; the court could not have reached its conclusion without applying *Tinker* to the off-campus speech.   475 F.2d at 1076–77.   The majority's assertions that our court has not previously applied *Tinker* to off-campus speech is an egregious misrepresentation of our precedent.

Furthermore, the majority at 27–30 erroneously reads *Ponce* as limiting the application of *Tinker* in the school context to Columbine-like situations. *Ponce* is only one of our court's decisions applying *Tinker*.   The distinction espoused by the majority ignores the paramount consideration that any threat, harassment, and intimidation of a teacher in a school environment must be taken seriously. Limiting an administrator's ability to act on threats in only Columbine-like, mass-shooting circumstances is a recipe for disaster.

But, even assuming our court has not previously applied *Tinker* to off-campus speech, in the light of the facts underlying this appeal, technological developments, as discussed *supra*, have rendered the distinction obsolete. The pervasive and omnipresent nature of the Internet, in many respects, has obfuscated the "on-campus/off-campus" distinction read into *Tinker* by some courts.   *Accord Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 220–21 (3d Cir. 2011) (Jordan, J., concurring) ("For better or worse, wireless internet access, smart phones, tablet computers, [and] social networking . . . give an omnipresence to speech that makes any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools.").   With students having instant access to the Internet anywhere, drawing such an arbitrary distinction both tortures logic and ignores history.

Skirting the issue, the majority at 22–23, in note 37, advocates that, despite rapidly changing technology, school administrators are powerless to

act absent specific Supreme Court guidance.   Once again, this flies in the face of the absolute necessity for school officials to act promptly to protect their students and teachers against threats, harassment, and intimidation.   To keep pace with technological developments, "speech" made over the Internet (whether through an on-campus or off-campus computer) that is intentionally directed at the school cannot be ignored based solely on the original source. The majority disagrees, citing *Morse*, 551 U.S. at 424 (Alito, J., concurring), for the proposition that "[i]t is a dangerous fiction to pretend that parents simply delegate their authority–including their authority to determine what their children may say and hear–to public school authorities", and *Shanley*, 462 F.2d at 964, for the proposition that a school board's           unreasonable "assumption of authority is an unconstitutional usurpation of the First Amendment".   Obviously, these general principles do not conflict with the issue at hand.

Here, Bell targeted his rap recording at the school by posting it on Facebook and YouTube, *admittedly knowing* students, and admittedly hoping administrators, would listen to it.   The majority states at 25 that the school's prohibition of student cell phones on-campus made it unlikely the recording would be heard on-campus.   This assertion is not supported by the summary-judgment record.   For example, in one instance, the rap recording reached the school through a student cell phone. Although Bell stated at the disciplinary-committee hearing that he never encouraged anyone at school to listen to the rap recording, he also stated he knew students would listen to it, and that part of his motivation was to "increase awareness of the situation".   Therefore, *Tinker* applies.   The majority's merely assuming that it does apply detracts from the very important considerations at play in this appeal.

Under *Tinker*, "school officials may regulate student speech when they

can demonstrate that such speech would substantially interfere with the work of the school or impinge upon the rights of other students". *Porter*, 393 F.3d at 615 (citation and quotation marks omitted). This standard can be satisfied by either showing a disruption has occurred, or by showing "demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption". *Shanley*, 462 F.2d at 974 (citation omitted).

Taking the school board's decision into account, and the deference we must accord it, the issue to be decided is whether a genuine dispute of material fact exists for whether the school board acted reasonably in finding Bell's rap recording constituted an ongoing, or reasonably foreseeable, substantial disruption. Because the school district's written policy embraces the *Tinker* analysis, this question boils down to whether the school board acted reasonably in determining the rap recording was a substantial disruption because it threatened, harassed, and intimidated two teachers. There is no genuine dispute of material fact; the school board acted reasonably.

The school-district's Discipline – Administrative Policy lists the offense "Harassment, intimidation, or threatening other students and/or teachers" as a "severe disruption". That policy establishes conduct that the school board considers sufficient to satisfy *Tinker*'s substantial-disruption test. Along that line, the superintendent testified at the preliminary-injunction hearing that her initial decision to suspend Bell stemmed from her belief the rap recording constituted a danger of a substantial disruption at the school. In that regard, threats against, and harassment and intimidation of, teachers are inherently disruptive. Finally, as Bell admitted, and the majority recognizes at 11, even assuming *arguendo* Bell's speech was not an imminent threat, the speech reflected the possibility of future violence by others. This, alone, resolves the

issue of whether it was reasonably foreseeable to disrupt the school.

Relying on language in *Shanley* stating school boards cannot rely on *ipse dixit* to demonstrate material and substantial interference with school discipline, the majority makes several logical missteps. It asserts at 23 that this dissent's *Tinker* analysis relies too heavily on the school board's interpretation that "threatening, intimidating and harassing" speech constitutes a "severe disruption". Again, regarding teachers, what else could such speech constitute? Under the majority's understanding of *Tinker*, a student could say anything so long as he set it to melody or rhyme. Once again, the majority refuses to acknowledge reality.

As the majority notes at 26–27, *Shanley* also states: "*Tinker* requires that presumably protected conduct by high school students cannot be prohibited by the school unless there are 'facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities . . . .'" 462 F.2d at 970 (citing *Tinker*, 393 U.S. at 514). As stated, threats against, and intimidation and harassment of, teachers by their very nature reasonably "forecast substantial disruption", regardless of whether an actual disruption occurs. Finally, the majority intentionally limits its discussion to the "threatening" aspects of Bell's speech, ignoring its "intimidating" and "harassing" aspects. Perhaps it does so because the broader terms of "intimidation" and "harassment" necessarily require less strenuous proof. In short, the majority confuses *ipse dixit* with reality.

Further examination of the rap recording demonstrates this. In addition to the above-discussed threats, intimidation, and harassment in the recording, Bell, for example, refers to the teachers as "perverts". He even derides the size of the breasts of the wife of one of the teachers ("his wife ain't

got no titties"). Those harassing comments alone forecast a substantial disruption to school discipline.

The majority at 26, in note 43, claims the school board's disciplinary policy embraces the majority's contention that the school may only discipline a student for speech originating physically on-campus because other listed "offenses" relate to on-campus conduct. This assertion is factually and logically incorrect. First, in addition to activities that commonly occur on-campus, the policy lists several prohibited "off-campus" activities, *e.g.,* behavior on a school bus, which likely occurs off school grounds. Second, under this rationale, Bell would be immune from disciplinary action were he to present the rap recording, with its extensive threatening, harassing, and intimidating portions, on television, over the radio, or in a newspaper. As *Sullivan* makes clear, speech conveyed through the latter media may be restricted. *E.g.,* 475 F.2d at 1076. Finally, this understanding ignores the nature of such comments; even if they are made "off-campus", the danger and disruptiveness of the comments do not cease to have effect the moment after being made. Rather, they remain linked to the speaker, and as the speaker comes closer to the subject (such as when the student attends school), the danger becomes more present and the likelihood of disruption increases. Therefore, the majority's attempt to limit the school board's policy as applying only to activities physically occurring on school grounds runs counter to the policy's express language and purpose.

After temporarily suspending Bell and holding two hearings, school officials considered the rap recording substantially disruptive. And, as noted, the school board upheld the recommendation of the disciplinary committee, after the board found Bell's rap recording constituted a threat, harassment, and intimidation. In doing so, the school board also reasonably forecast

71

further substantial disruption to the school's mission and school administrators' responsibility to protect students and faculty. (Significantly, the disciplinary-committee hearing and school-board meeting more than satisfied Bell's due-process rights. *See Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 691–92 (5th Cir. 2011) (explaining alternative education program does not violate Fourteenth Amendment and, for temporary suspensions, only "an *informal* give-and-take-between student and disciplinarian" is required) (emphasis added).)

Citing *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 221 (5th Cir. 2009) for the proposition that school officials "must base their decisions on fact, not intuition", the majority at 19 intimates that the school board disciplined Bell based on the "mere expectation" of disruption. The summary-judgment record shows otherwise. For example, Bell's mother testified that members of the community believed the language in the rap recording was threatening; Bell admitted the possibility of violence against the coaches, stating he was "foreshadowing something that might happen"; and, most importantly, Coach W. testified that he would not let members of the basketball team leave the gymnasium until he was in his vehicle, which demonstrates an *actual* disruption occurred.

Seeking shelter under the First Amendment, Bell makes two meritless claims: his rap recording is merely hyperbole and, therefore, protected speech; and, as a corollary, the school board acted unreasonably.

First, Bell's claim that the rap recording is not threatening, harassing, or intimidating is immaterial. Under *Tinker*, a school may take action so long as the speech is reasonably forecast to cause a material and substantial disruption. *Shanley*, 462 F.2d at 974–75. Here, as discussed *supra*, it is reasonable to conclude that a material-and-substantial disruption could occur

72

as a result of the statements against the coaches. Possible fact-based substantial disruptions range, for example, from the coaches' inability to properly teach, resulting from students' loss of respect for the coach, to acts of violence carried out against the coaches.

Second, Bell's assertion that the school-board determination was unreasonable is, itself, unreasonable as a matter of law. *E.g., Burnham v. Ianni*, 119 F.3d 668, 679 (8th Cir. 1997). To find Bell's claim meritorious would require holding no objectively reasonable person could interpret language in Bell's rap recording as threatening, intimidating, or harassing. Not only does such a conclusion defy common sense, but it also goes against the undisputed evidence, in particular Coach W.'s statement that the language frightened him.

The majority attempts to bolster its untenable position by claiming at 2 that the school board did not demonstrate the rap recording "caused a substantial disruption of school work or discipline, or that school officials forecasted or reasonably could have forecasted such a disruption". *See also Maj. Opn.* at 23–25 & nn.38 & 41. The school board is not required to engage in a "substantial disruption" analysis commensurate with that undertaken by courts assessing speech infringement under *Tinker*; rather, the school board is required to show "demonstrable factors" that would give rise to any reasonable forecast of a substantial disruption. *E.g., LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001); *see also, e.g., D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 180 F. App'x 232 (2d Cir. 2006) (affirming, without supplementation, the district court's conclusion that *Tinker* supported the school board's suspension of a student after finding he had "threatened use and/or contemplated use of a weapon in violation of the Code of Conduct").

In sum, *Tinker*-based judicial decisions assessing substantial-disruption

speech review the "totality of the relevant facts", *LaVine*, 257 F.3d at 989; "*Tinker* does not prescribe a uniform, 'one size fits all' analysis. The [c]ourt must consider the content and context of the speech, and the nature of the school's response", *Lowery v. Euverard*, 497 F.3d 584, 588 (6th Cir. 2007). "We look not only to [the student's] actions, but to all of the circumstances confronting the school officials that might reasonably portend disruption". *LaVine*, 257 F.3d at 989 (citation omitted).

Generally, *Tinker* provides school administrators may discipline a student for speech that materially and substantially interferes "with the requirements of appropriate discipline in the operation of the school". 393 U.S. at 513 (citation and internal quotation marks omitted). Other courts have provided additional factors for evaluating the substantiality of a potential disruption. Relevant facts and circumstances may include: whether the infringement arose from a "desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint"; whether the speech identifies an educator "by name, school, or location"; whether a "reasonable person could take its content seriously"; whether "the record clearly demonstrates that" anyone took the speech seriously; how the speech reached the school; and whether the speech "was purposely designed by [the student] to come onto the campus". *Snyder*, 650 F.3d at 926, 929, 951 (Smith J., concurring). Additional factors include: whether the speech "directly pertained to events at" the school; the student's "intent in" engaging in the speech; whether the speech was misleading; the nature and seriousness of the penalty levied on the student; and any in-school disturbances, including administrative disturbances involving the speaker brought about "because of the need to manage" concerns over the speech. *Doninger v. Niehoff*, 527 F.3d 41, 50–52 (2d Cir. 2008).

The totality of the relevant facts are addressed through the lens of the bedrock principle that "the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts", and with the understanding that "*Tinker* does not require certainty that disruption will occur, but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption". *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267–68 (1988) (citation and internal quotation marks omitted); *LaVine*, 257 F.3d at 989; *see also Lowery*, 497 F.3d at 596 ("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place.").

Here, Bell presented a transcription of the recording containing the threats and references to guns, and he admitted at the disciplinary-committee hearing that he posted the recording to public websites on the Internet, intending the language to reach both the school community and the public at large. Therefore, not only does the summary-judgment record support the school board's finding the recording threatened, intimidated, and harassed two coaches, but this conclusion stems from Bell's own submissions to, and admissions before, the disciplinary committee.

The majority also contends at 7, in note 21, that there is no evidence indicating how many of Bell's friends listened to the posted recording. This is irrelevant. Bell admits, and the majority recognizes at 4, that Bell intended the speech to reach the school community, which it did. The majority further contends at 7, in note 21, that the Facebook comments undermine this dissent's claim that the school board could have forecasted reasonably a substantial disruption. The majority's logic is flawed; although potentially representative of how some would interpret the recording, simply because one segment of the

population views speech one way does not make another understanding objectively unreasonable. This red herring by the majority undermines its position—the only issue of consequence is whether the school board acted *reasonably* in viewing Bell's speech as "threatening, intimidating, or harassing", *not* which interpretation is "more reasonable".

Further, the majority's claim ignores that, pursuant to school-district policy, threatening, harassing, and intimidating teachers is a subset of conduct constituting "severe disruptions". It also fails to recognize that, by finding Bell threatened, harassed, and intimidated the two coaches, the school board implicitly found Bell caused a severe disruption. Given the content of the rap recording, Coach W.'s reaction and communication with school authorities, Bell's claim that he was speaking about real life, the dissemination of the rap recording with the knowledge students would access it, and the access by at least one student in the presence of Coach W., there is no genuine dispute for whether the school board acted reasonably; it did.

**B.**

Before this court for *de novo* review are cross-motions for summary judgment. As discussed *supra*, each motion must be reviewed independently. Assuming *arguendo* a genuine dispute of material fact exists regarding the school board's summary-judgment motion, then a genuine dispute of material fact also exists regarding Bell's summary-judgment motion.

The key factor for reviewing the school-board's motion is the understandable, and well-established, deference that must be accorded its decision. It goes without saying that no such deference is accorded the First Amendment claim in Bell's summary-judgment motion. The deference accorded the school board is incorporated in its reliance on true threats and substantial disruption as the independent bases for its decision.

76

No. 12-60264

Accordingly, assuming *arguendo* a genuine dispute of material fact exists regarding that decision by the school board, summary judgment cannot be rendered for Bell on his First Amendment claim.   Instead, that claim must be remanded to district court for trial.   In other words, assuming *arguendo* the majority is correct in vacating the summary judgment awarded the school board on Bell's First Amendment claim, the majority errs, nevertheless, in rendering summary judgment for Bell on that claim.

**III**.

For the foregoing reasons, for Bell's First Amendment claim, I dissent from the majority's both vacating the summary judgment for the school board and rendering summary judgment for Bell.   Instead, the district court's judgment should be affirmed on all issues.   In the alternative, assuming *arguendo* the school board is not entitled to summary judgment against Bell's First Amendment claim, the majority cannot render summary judgment for Bell on that claim; it must be remanded to district court for trial.

77